

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0086-11

### IVAN WILLIAM SANCHEZ, Appellant

### v.

### THE STATE OF TEXAS

### ON DISCRETIONARY REVIEW
### FROM THE FOURTH COURT OF APPEALS,
### BEXAR COUNTY

*Womack, J., delivered the opinion of the unanimous Court.*

A seventeen-count indictment charged the appellant with sexually abusing his step-daughter. The State's outcry witness suffered a loss of mental faculties and was unavailable to testify at trial. Over the appellant's objection, the trial court allowed the outcry witness's testimony from a pre-trial hearing to be read to the jury. The jury found the appellant guilty of four counts of indecency with a child by sexual contact and one count of aggravated sexual

assault of a child. The Fourth Court of Appeals affirmed, holding that the outcry witness's testimony from a pre-trial hearing was admissible. We granted review of that issue.

We hold that a pre-trial hearing conducted under Code of Criminal Procedure Article 38.072 § 2(b)(2) is intended only to determine the reliability of the complainant's out-of-court statement; therefore, the defendant's opportunity for cross-examining the outcry witness at such a hearing is inadequate to allow the admission of the hearing testimony at trial. We shall reverse the Court of Appeals and remand this case to that court for a harm analysis.

## I. Factual Background

## A. Pre-trial

The appellant was indicted in 2006 on ten counts of indecency with a child by sexual contact and seven counts of aggravated sexual assault of a child, R.F. (his step-daughter). The State initially served notice on the appellant that Jennifer Guzman would serve as its outcry witness.[1]

Later, in February 2009, the State served another notice on the defense, advising that it had discovered that "Guzman was not the first adult the complainant told about the offenses." The State then designated Angelica Newsome[2] and Terry Melendez[3] as outcry witnesses and provided summaries of their expected testimony. According to the summaries, Newsome and Melendez were both present when R.F. first made her outcry.

---

[1] As discussed below in Section II.A., an outcry witness, under Code of Criminal Procedure art. 38.072, is the first adult to whom a child or disabled individual describes being the victim of certain crimes, including many sexual crimes. An outcry witness may testify, as an exception to the hearsay rule, about the victim's out-of-court description of the offense.

[2] The State's notice spelled her last name "Newsom," but the trial transcripts and the parties' briefs spell it "Newsome."

[3] Some documents in the record spell Melendez's first name "Terri."

In response, the appellant filed a motion, arguing that there could be only "one outcry witness per occasion," and that "this purported outcry statement is not admissible and does not meet the requirements of Article 38.072." The appellant requested a hearing, as required by Article 38.072, §2(b)(2).

On May 20, 2009, the trial court held a pre-trial hearing "on the admissibility of [the] outcry statement[s] of Angelica Newsome and Terri Melendez." The State presented two witnesses, R.F. and Newsome. R.F. had lived with the appellant for most of her life and had believed he was her biological father until, when she was 13 years old, he told her that he was her step-father. R.F. said that the appellant started touching her inappropriately in 1999 when she was 9, and he last touched her inappropriately in 2004 when she was 14.[4]

She told Newsome (her best friend's mother) of the abuse when she was 13. R.F. said that she told Newsome that the appellant "touche[d]" her, and "would take and carry [her] to the living room and he would rape [her] in the middle of the night." While Newsome was the first adult she told of the abuse, Terry was also in the house at the time. R.F. said that she later told her cousin, Jennifer Guzman, of the assaults. After her first outcry, R.F. said that Newsome spoke with the appellant's mother (who, along with several of R.F.'s siblings, lived with R.F. and the appellant), who responded by preventing R.F. from seeing Newsome or Newsome's daughter.

Newsome characterized R.F. as being "like my second daughter." She said when R.F. was young, she would comment on how much she loved the appellant and his mother. Around the age of nine or ten, however, Newsome noticed that R.F. "never wanted to leave [her] house anymore.

---

[4] Though these are the dates R.F. gave at the pre-trial hearing, the years and ages do not match up with her birth year of 1991. At trial, she specified that the abuse began in 2001 and ended in 2005.

She … didn't want to be around her grandmother or [the appellant]."

Newsome then testified that when R.F. was "about 14" years old, she was at Newsome's house playing with Newsome's daughter. "[T]hey came out crying from my daughter's room," Newsome said. When she tried to ask R.F. what was wrong, R.F. "could barely talk." R.F. told her that the appellant "had picked her up, took her into the other room and had sexually assaulted her.… She said he put his penis in her."

Newsome told the appellant's mother what R.F. had told her, at which point R.F.'s access to Newsome and her daughter was cut off. Newsome said that she reported what R.F. told her to the Department of Child Protective Services (CPS), but nothing seemed to have come of that. Finally, Newsome said that, after R.F. told her of the abuse, R.F. also told her cousin Terry, who was in the house at the time.

Defense counsel then cross-examined Newsome. He first inquired as to her date of birth, and whether she had been convicted of a felony or crime of moral turpitude. She said she had not. He then questioned her about R.F.'s statement and her response to it. Newsome said that she did not make a written statement to CPS, and she did not remember the name of the person she spoke with at CPS. She could remember that the outcry occurred during 2005, and sometime during the middle of the day, but she could not remember what time of year it occurred. Newsome explained that her ability to place past events in the correct time frame was hindered by seizures that she had.

Defense counsel asked Newsome about the wording that R.F. used.

> "She said that her father … picked her up, took her to the other room – she actually told me … she was sleeping with her brothers and sisters in the same room. She was picked up out of that room and taken to another room and raped.…She said he got on top of her and put his penis in her. She was clear in

what happened."

Newsome said that R.F. had used the words "penis" and "vagina." Defense counsel asked if Newsome had asked R.F. for more specifics about the assaults. Newsome said she did not.

The State and defense counsel asked Newsome about how well she knew the appellant, and how often the appellant had come to her house to pick up R.F.

After Newsome was excused, the State told the trial court that the sheriff's department was searching for Guzman, who originally had been designated as the outcry witness, but that "based on the testimony, the [S]tate would submit that the proper outcry witness is Ms. Newsome." The trial court agreed.

Defense counsel argued that "[Newsome's] seizure problems and the fuzziness of her ability to give us a specific date or month" meant that the trial court could not accurately determine the reliability of the outcry based on the "time, content, and circumstances" of the outcry, as required by the Code of Criminal Procedure. The trial court disagreed and ruled that Newsome could testify to R.F.'s out-of-court statement.

### B. Newsome's Availability

A month later, on June 22, 2009, the trial court held a hearing on a speedy-trial motion brought by the appellant.

At the hearing, the State told the court that Newsome was in the Bexar County jail. Without stating why Newsome had been arrested, the State advised that there had been no attorney appointed to represent Newsome, but that "someone, be it the State or the Court, has filed for a psychiatric evaluation to determine her competency for her trials." The State then asked the trial court to find that Newsome was unavailable to testify and that the transcript of her

testimony at the pre-trial hearing could be admitted under Texas Rule of Evidence 804(b)(1).[5] The trial court ruled that it would not admit the prior testimony, although it was open to persuasion on the matter if the State could provide authority for admitting the evidence.

## C. Trial

### 1. Guzman's Testimony

The trial began the next day, June 23. In its opening statement, the State told the jury that it "expects that you will see Ms. Newsome on the stand" and gave a summary of her potential testimony that matched what Newsome had said at the May 20 pre-trial hearing. The State also said that it would call Jennifer Guzman, and that the jury would hear evidence that R.F. "opened up and told her cousin Jennifer Guzman what she had been living with since 9 or 10."

Guzman was the State's first witness. Guzman said that on October 19, 2005, after seeing a tearful conversation between R.F. and R.F.'s mother,[6] Guzman offered R.F. and her twin brother S.F. the opportunity to live with her and her family in Poteet. R.F.'s mother signed a document purporting to give Guzman custodianship of the twins.

The State then offered into evidence two pages on which Guzman had transcribed notes from her personal calendar concerning nine dates between October 19, 2005, and November 28, 2008. The notes included notations about R.F. telling Guzman about the appellant's assaults, and a transcription of a conversation between R.F. and her twin brother S.F. (who had since died), in which S.F. seemed to have remembered something that corroborated part of R.F.'s story. Defense

---

[5] Rule 804(b)(1) allows the admission of testimony at another hearing to be admitted at a criminal trial if, at the prior hearing, "the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

[6] R.F.'s mother seems to have had difficulties, perhaps including drug addiction, that kept her from being very involved in much of R.F.'s life.

counsel objected on hearsay grounds and argued that the exhibit was "a surreptitious way of trying to get outcry testimony introduced, although [Guzman] is not the outcry witness." The trial court overruled the objection and admitted the notes into evidence.

The State then asked Guzman whether "there was ever a time that R.F. told you that she had been hurt … by anyone?"

> [Defense counsel]: Objection. It's hearsay. And again, we're trying to back-door this outcry. And it's a –

> [State]: If I may, Your Honor, this has been a misrepresentation by the defense. The law allows multiple outcry –

> The Court: I don't need the speeches or lectures. Your objection will be overruled.

Guzman then tesstified that sometime in November 2005 R.F. began crying. Guzman said that she asked R.F. what was wrong, and R.F. said that the appellant had hurt her. Guzman's testimony was not more specific about what R.F. said; however, her notes stated that on November 5, 2005, "[R.F.] told me about [the appellant] sleeping (having sex with her) with her [*sic*]. She was crying."

### 2. Newsome's Pre-trial Testimony Read to the Jury

Outside the presence of the jury, the Court asked the State who its next witness would be. The State replied that it was "probably" R.F. The State said that Newsome was "in the holding cell" and that Newsome's appointed attorney, Virginia Maurer, had spoken with the State regarding Newsome's ability to testify. The trial court held a brief hearing in which Maurer testified that Newsome had been arrested and charged with obtaining drugs by fraud. Maurer said that when she met with Newsome and told her that she needed to testify at this trial, Newsome responded by telling her that "famous people" named "OC and AC" were using the jail to

"chang[e] her DNA and she's now half man, half woman." The trial court found that Newsome was unavailable as a witness.

The State moved to admit Newsome's testimony from the pre-trial hearing. Defense counsel objected that doing so would violate the appellant's constitutional right to confront his accusers. Defense counsel argued that, although he had cross-examined Newsome at the pre-trial hearing, the motive for that cross-examination was different from what the motive for cross-examination would be at trial, and thus the former testimony was not admissible under Rule 804(b)(1). The trial court overruled this objection, and the State read to the jury a transcript of Newsome's testimony from the pre-trial hearing.

### 3. R.F.'s Trial Testimony

The State then called R.F. She testified that beginning around age 9 or 10 the appellant would come into her room at night, while she was trying to sleep, and put his hands under her shirt to touch her breasts. She said that this behavior then advanced to the appellant pulling down her pants, touching her vagina, and inserting his finger. She said that this behavior happened "often."

R.F. said that this made her uncomfortable, so she began sleeping in her brother's bedroom. She said the appellant responded to this by sneaking into the room at night, carrying her out into the living room, and raping her. She said that one time, during one of these rapes, the appellant "tried to stick his penis in [her] mouth," and forced her to put her mouth "on" his penis. She said that these rapes occurred repeatedly over an extended period of time.

R.F. said that for a while she and S.F. lived with their mother, separately from the appellant, but that the twins were forced to move back in with the appellant in 2005. R.F. said the

appellant tried to pull down her pants one night, but she was by then large enough to fend him off. Sometime thereafter she told Newsome about the assaults. In October 2005, R.F. and S.F. ran away from the appellant, eventually to wind up with Guzman. R.F. said that she told Guzman about the appellant's assaults, and that Guzman's actions led to an official investigation into the matter.

## 4. Other Witnesses

The State presented three other witnesses. A detective described the investigation. A pediatrician testified about delayed outcry. A sexual-assault nurse examiner, Annette Santos, said that an examination of R.F. showed that R.F. had been sexually active, but that R.F. told Santos that she had voluntarily had sex sometime after the end of the appellant's assaults. Santos read into evidence her notes from her examination of R.F., including statements from R.F. that more or less paralleled the allegations R.F. made at trial.

The appellant presented two witnesses who testified that they had heard R.F. recant her entire story. He also called the social worker who investigated the family on a couple of occasions. The appellant's defense was that R.F. made up the stories because she was angry when she learned that the appellant was not her biological father. He argued that R.F.'s rape allegations did not make sense, because there were always numerous people in the house when the rapes allegedly occurred, yet no one ever stopped the rapes or reported the rapes, and no one other than R.F. testified that the rapes occurred.

## 5. Verdicts

After the parties rested, the trial court granted a directed verdict of acquittal on one count of aggravated sexual assault that alleged the appellant had touched R.F.'s sexual organ with his

mouth. The State then abandoned four counts, all alleging various types of aggravated sexual assault occurring after R.F. moved back in with the appellant in 2005.

On the twelve remaining charges, the jury returned five guilty verdicts and seven acquittals. The mixed verdicts show that the jury believed R.F. as to the appellant's rubbing her breasts, touching her sexual organ, and inserting his finger prior to 2005. The jury also believed that he touched her genitals after she moved back in with him in 2005. The acquittals show that the jury did not believe beyond a reasonable doubt that the appellant raped R.F., that he caused his sexual organ to touch her mouth, that he touched her breasts in 2005, or that he caused her to touch his genitals in 2005.

The appellant received concurrent sentences of 28, 15, 7, 5, and 5 years for his convictions.

### D. On Appeal.

The appellant brought three points of error to the Fourth Court of Appeals, arguing that: 1.) Guzman was not a proper outcry witness, thus her testimony about R.F.'s outcry as well as her notes were inadmissible hearsay; 2.) Reading Newsome's pre-trial testimony violated the appellant's Constitutional right to confront his accusers because he did not have adequate opportunity or motive to cross-examine her at the pre-trial hearing; and 3.) The trial court misapplied case law when overruling the appellant's speedy-trial motion.

The Court of Appeals agreed with the appellant that Guzman was not a proper outcry witness, and that her testimony and notes constituted inadmissible hearsay.[7] However, because R.F. and Santos "testified about the same matter, in more detail, and without objection," the

---

[7] *Sanchez v. State*, 335 S.W.3d 256, 262 (Tex. App.–San Antonio 2010).

Court of Appeals determined that the error was harmless.[8]

In his second point, the appellant argued that had he been able to cross-examine Newsome at trial, he could have asked her about potential bias against him and, in light of her seizures and later delusions, whether she was capable of accurately remembering what R.F. said.

The Court of Appeals determined that the appellant had adequate motive and opportunity to cross-examine Newsome about these matters at the pre-trial hearing. The Court of Appeals began by noting that the purpose of a hearing prior to admission of outcry testimony "is to determine whether the outcry statement is reliable based on the time, content, and circumstances of the statement."[9]

> One indicia [*sic*] of whether the child's outcry is reliable is whether evidence exists of prior prompting or manipulation by adults. Therefore, at the pretrial hearing, appellant had a basis for exploring whether Newsome held any bias against him that would have caused her to prompt or manipulate the complainant. Also, because the outcry statement must be one that in some discernible manner describes the alleged offense, appellant had a basis for exploring Newsome's ability to recall the time, content, and circumstances of the outcry. In fact, at the pretrial hearing, appellant's counsel conducted an extensive cross-examination of Newsome about the timing of the outcry and the specific words the complainant used in describing the offense …. [10]

Therefore, "appellant's motive to cross-examine Newsome at the pretrial hearing was similar to his stated motive for cross-examining her at trial."[11]

The Court of Appeals also overruled the appellant's speedy-trial claim and affirmed the conviction. We granted review as to the Court of Appeals's holding regarding Newsome's

---

[8] *Id.*, at 263.

[9] *Id.*, at 264 (quotation and citation omitted).

[10] *Id.* (citation omitted).

[11] *Id.*

testimony.

## II. Legal Background

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."[12] Whether hearsay is admissible at a criminal trial is determined by the Texas Rules of Evidence and the Sixth Amendment to the federal Constitution.

### A. Article 38.072

So far as Texas's law of evidence is concerned, hearsay is inadmissible unless it falls into one of the exceptions in Rules of Evidence 803 or 804, or it is allowed "by other rules prescribed pursuant to statutory authority."[13] One of these "other rules" is Article 38.072 of the Code of Criminal Procedure. When a defendant is charged with certain offenses against a child under the age of 14 or a disabled individual, Article 38.072[14] allows into evidence the complainant's out-of-court statement so long as that statement is a description of the offense and is offered into evidence by the first adult the complainant told of the offense. Though the terms do not appear in the statute, the victim's out-of-court statement is commonly known as an "outcry," and an adult who testifies about the outcry is commonly known as an "outcry witness."

Article 38.072 has additional requirements that must be met before an outcry witness may testify. At least 14 days before the trial on the merits begins, the State must notify the defendant of its intention to call an outcry witness, who must be identified. The State must provide a

---

[12] TEX. R. EVID. 801(d).

[13] TEX. R. EVID. 802.

[14] The statute has been amended by three acts of the legislature since proceedings began against the appellant. *See* Act of June 11, 2009, 81st Leg., R.S., ch. 284, §1; Act of June 19, 2009, 81st Leg., R.S., ch. 710, § 1; Act of April 21, 2011, 82nd Leg., R.S. Ch.1 § 2.07. None of those changes affected the statute's application to this case. We shall refer to the current text of Article 38.072.

summary of the outcry statement that will be offered into evidence.[15] Outside the presence of the jury,[16] the trial court must hold a hearing to determine, "based on the time, content, and circumstances of the statement" whether the victim's out-of-court statement is "reliable."[17] Finally, the victim must either testify, or be available to testify, "at the proceeding in court or in any other manner provided by law."[18]

## B. The Sixth Amendment

In addition to the restrictions that the statute and the rules place on the admission of hearsay, the Sixth Amendment to the federal Constitution broadly limits the admission of hearsay by giving a defendant the right "to be confronted with the witnesses against him."[19] Applying this guaranty to hearsay first requires sorting hearsay statements into categories described as testimonial and non-testimonial. While the exact contours of what is and is not testimonial continues to be defined by courts, it generally may be said that testimonial statements tend to appear more formal and more similar to trial testimony than non-testimonial statements. At the most formal end of the spectrum is what the Supreme Court has termed the "core class of testimonial statements," consisting of, among other things, prior in-court testimony, including

---

[15] TEX. CODE CRIM. PROC. art. 38.072 § 2(b)(1).

[16] The Article 38.072 hearing in this case was a pre-trial hearing, but the statute does not require that. In other cases, the hearing was held during the trial but outside the presence of the jury. *See, e.g.*, *Buckley v. State*, 758 S.W.2d 339, 340-41 (Tex. App.–Texarkana 1988), *aff'd* 786 S.W.2d 357 (Tex. Cr. App. 1990).

[17] *Id.*, at § 2(b)(2).

[18] *Id.*, at § 2(b)(3).

[19] U.S. Const. amend. VI.

testimony given at pre-trial hearings.[20]

The Sixth Amendment does not bar the admission of non-testimonial hearsay.[21] "An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the … abuses the Confrontation Clause targeted."[22]

In order to introduce testimonial hearsay over a Sixth Amendment objection, the State must show that the declarant who made the out-of-court statement is unavailable, and that the defendant had a prior opportunity to cross-examine that declarant.[23] "That prior opportunity for cross-examination must serve the same function as is normally accorded to adversarial cross-examination in the courtroom during trial: '… to test the witness' perceptions and memory … [and] to impeach, *i.e.*, discredit, the witness.…'"[24]

## III. Issues and Arguments

### A. The Issue in This Case

There are two levels of hearsay before us. First, Newsome testified at the pre-trial hearing regarding what R.F. had told her outside of court. Then, at the trial, Newsome's prior testimony regarding R.F.'s out-of-court statements was read to the jury. Thus Newsome's hearsay contained R.F.'s hearsay. When hearsay contains hearsay, the Rules of Evidence require that each part of

---

[20] *Crawford v. Washington*, 541 U.S.36, 51-52, 68 (2004) ("Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial .…").

[21] *See Michigan v. Bryant*, 131 S.Ct. 1143, 1153 (2011).

[22] *Crawford*, 541 U.S., at 51.

[23] *Id.*, at 68-69.

[24] *Coronado v. State*, — S.W. 3d —, 2011 WL 4436474, at * 5 (Tex. Cr. App. Sept. 14, 2011) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

the combined statements be within an exception to the hearsay rule.[25]

R.F.'s statement, as relayed by Newsome, would be admissible under Article 38.072 had Newsome testified,[26] and the parties do not dispute this. Nor is there any dispute before us of whether Newsome was actually available. And, as mentioned earlier, the use of prior testimony is plainly testimonial hearsay. Thus these matters are not at issue here.

Additionally, while the appellant made trial objections under both the Sixth Amendment and Texas Rule of Evidence 804(b)(1), he has only presented us a Sixth Amendment challenge. The importance of this is that many of our precedents that look at Rule 804(b)(1) objections (including those cited by the parties) do not consider whether a party had an opportunity for cross-examination, but instead whether a party had a "similar motive" for cross-examination at an earlier proceeding.[27] While Rule 804(b)(1) and the Sixth Amendment may be similar in theme, they are jurisprudentially distinct in both scope and consequence.

Therefore, the only issue for us to decide in this case is whether the appellant had an adequate opportunity to cross-examine Newsome at the Article 38.072 hearing.

### B. The Parties' Arguments

The appellant urges us to adopt a bright-line rule and hold, as have the Colorado[28] and

---

[25] TEX. R. EVID. 805.

[26] We have previously held that outcry testimony admitted under Article 38.072 comports with the guarantees of the Sixth Amendment because the child declarant is available for cross-examination at trial. *Buckley v. State*, 786 S.W.2d 357, 359-60 (Tex. Cr. App. 1990); *see also Crawford*, 541 U.S., at 59-60 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.")

[27] *See e.g., Coffin v. State*, 885 S.W.2d 140, 147 (Tex. Cr. App. 1994).

[28] *People v. Fry*, 92 P.3d 970 (Colo. 2004).

Wisconsin[29] supreme courts, that no pre-trial hearing provides an opportunity for cross-examination that would be adequate to allow the pre-trial testimony of an unavailable witness to be admitted at trial. The appellant argues that the narrow scope of pre-trial hearings in Texas means that defendants seldom have the opportunity to engage in the broad-ranging cross-examination they might make at trial.

As an alternative to a bright-line rule, the appellant argues that a case-specific analysis of this case shows that he did not have an adequate opportunity for cross-examination. He argues that the purpose of the pre-trial hearing in this case was only "to determine whether Newsome was reliably the first adult [R.F.] told of a cognizable offense." Thus there was no opportunity to cross-examine Newsome regarding her credibility.

The State argues, in line with the Court of Appeals, that the appellant had a similar opportunity and motive to cross-examine Newsome at the pre-trial hearing. According to the State, if Newsome "had a bias, was untruthful, or had a motivation that would cause her to testify falsely about the outcry statement, 'fleshing that out' at the pre-trial hearing would have made her statement unreliable and therefore inadmissible."

## IV. Analysis

It is first necessary to appreciate the particular nature of a hearing held under Article 38.072. Every hearing outside the presence of the jury will be limited in scope, but the focus of an Article 38.072 hearing is exceptionally narrow.

The Court of Appeals said that an inquiry into Newsome's motives and mental state was

---

[29] *State v. Stuart*, 695 N.W.2d 259 (Wis. 2005).

both possible and appropriate during the Article 38.072 hearing.[30] While we have not issued an opinion describing the scope of Article 38.072 hearings, the Court of Appeals's holding is at odds with opinions from other courts of appeals. These contrary opinions hold, generally, that the only relevant question at an Article 38.072 hearing is whether, based on the time, content, and circumstances of the outcry, the outcry is reliable.

In *Holland v. State*, the defendant characterized the outcry witness's testimony as unreliable because the outcry witness and the defendant were engaged in a custody dispute.[31] The Third Court of Appeals explained that Article 38.072 is concerned only with the reliability of the outcry, thus "Appellant's concern with [the credibility of the outcry witness] has nothing to do with [Article] 38.072."[32] In the Third Court's interpretation, the Article 38.072 hearing was to allow the trial court to determine the reliability of the outcry, but the credibility of the outcry witness was a matter for the jury: "The trier of fact had evidence to conclude that [the outcry witness] was not fabricating what the child told her and the judge had evidence to conclude that the child's declaration was sufficiently reliable under art. 38.072."[33]

During the Article 38.072 hearing in *Broderick v. State*, the defendant tried to question the outcry witness regarding the layout of the house in which the abuse took place, as well as

---

[30] *See Sanchez*, 335 S.W.3d, at 264.

[31] 770 S.W.2d 56, 59 (Tex. App.–Austin 1989), *aff'd* 802 S.W.2d 696 (Tex. Cr. App. 1991). While the lower court's opinion is somewhat ambiguous regarding the setting of the appellant's objection, our opinion explains that it came during a hearing conducted outside the presence of the jury, at which the outcry witness explained the time, content, and circumstances of the outcry (*i.e.*, an Article 38.072 hearing). 802 S.W.2d, at 698.

[32] 770 S.W.2d, at 59.

[33] *Ibid*.

what the outcry witness remembered from the time frame when the abuse occurred.[34] The trial

court sustained the State's objection that such questions were outside the scope of the hearing.

The Court of Appeals upheld this decision, determining that "[t]he phrase 'time, content, and

circumstances' refers to 'the time the child's statement was made to the outcry witness, the

content of the child's statement, and the circumstances surrounding the making of that

statement.'"[35] Broderick's questions, in contrast, "focused on the circumstances of the abuse

itself," and thus were "outside the narrow scope of the inquiry into the time, circumstances, or

content of the outcry statement."[36]

Without endorsing particular holdings in these cases, we believe the opinions more

accurately describe the scope of an Article 38.072 hearing than did the Court of Appeals here.

That statute charges the trial court with determining the reliability based on "the time, content,

and circumstances of the statement;"[37] it does not charge the trial court with determining the

reliability of the statement based on the credibility of the outcry witness.

The Court of Appeals believed that because an indicium of reliability is whether the

outcry was prompted or manipulated by adults, evidence of the outcry witness's biases is relevant

at an Article 38.072 hearing. This is not correct. The outcry witness's biases may be such that a

fact-finder would not believe the outcry statement as relayed by the witness, but that is not a

matter that the legislature has given to the trial court's discretion. The same is true of the outcry

---

[34] 89 S.W.3d 696, 697-98 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd).

[35] *Id.*, at 699 (quoting *MacGilfrey v. State*, 52 S.W.3d 918, 921 (Tex. App.–Beaumont 2001, no pet.)).

[36] *Id.*

[37] TEX. CODE CRIM. PROC. art. 38.072 § 2(b)(2).

witness's ability to remember, which the court below also thought relevant at an Article 38.072 hearing.

If the "circumstances" of the statement had the meaning that the Court of Appeals gave it, Article 38.072 hearings could become elaborate mini-trials in which defendants could cross-examine the outcry witness regarding biases in order to ferret out background evidence of prompting or manipulation. We do not believe Article 38.072 authorizes such a broad-ranging inquiry. The only task it assigns the trial court is to determine whether, based on the time, content, and circumstances of the statement, the outcry is reliable. The trial court would be within its discretion at an Article 38.072 hearing to disallow as irrelevant a line of questioning that addressed the biases or memory of the outcry *witness* but not the time, content, and circumstances of the *outcry*.

We have held that for other types of pre-trial hearings we will examine on a case-by-case basis whether particular hearings allowed the defendant adequate opportunity for cross-examination.[38] Those cases are distinguishable, however, because of the very narrow nature of an Article 38.072 hearing. In *Russell*, we dealt with an Article 16.01 examining trial, in which a magistrate is charged with "examin[ing] into the truth of the accusation made."[39] As we noted in *Russell*, "the sole function of the magistrate conducting the examining trial is to make a finding on the issue of probable cause for the purpose of committing to jail, discharging or admitting to

---

[38] *See Russell v. State*, 604 S.W.2d 914, 921-22 (Tex. Cr. App. 1980) (holding that "[a]s statutorily structured, an [Article 16.01] examining trial … does not provide an adequate opportunity for cross-examination," but from that "it does not necessarily follow … that every examining trial withholds a complete and adequate opportunity to cross-examine the complaining witness and any others.").

[39] TEX. CODE CRIM. PROC. art. 16.01.

bail the accused."[40] Such a hearing could be very narrow in scope, but in appropriate circumstances it could allow adequate cross-examination of witnesses as to credibility. Witness credibility may not always be relevant at an examining trial, but neither is it *per se* irrelevant in such a hearing. The same could be said of other pre-trial hearings, such as suppression hearings.

In contrast, the narrow range of discretion that Article 38.072 allows a trial court means that the credibility of the outcry witness is not a relevant issue at a hearing to determine admissibility of an outcry. A hearing in which the sought-after cross-examination would be necessarily irrelevant does not provide an adequate opportunity for cross-examination such that testimony from the hearing is admissible at a trial on the merits.

Trial courts have great discretion in how they manage their Article 38.072 hearings. However, we do not wish to encourage parties to attempt to elicit irrelevant testimony in order to get impeachment evidence for trial. Our ruling today is meant not only to vindicate defendants' Sixth Amendment rights, but also to ensure that trial courts decide the reliability of an outcry based only on the time, content, and circumstances of the statement, leaving the determination of the outcry witness's credibility to the fact finder at trial.

### V. Conclusion

Because an Article 38.072 hearing provides a defendant with an inadequate opportunity to cross-examine an outcry witness's credibility, admitting testimony from an Article 38.072 hearing at a trial when the witness is unavailable violates the Sixth Amendment. We reverse the Court of Appeals and remand this case for an analysis of the harm caused by the unconstitutional admission of Newsome's pre-trial testimony.

---

[40] *Russell*, 604 S.W.2d, at 921 (citations omitted).

Delivered December 14, 2011.
Publish.