**Opinion issued November 26, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00612-CR

———————————

**LESTER JACK BOWEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 78th District Court**
**Wichita County, Texas**
**Trial Court Case No. 59,135-B**

## MEMORANDUM OPINION

A jury convicted appellant, Lester Jack Bowen, of four counts of aggravated

sexual assault of a child and one count of indecency with a child by contact.[1] The

---

[1] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i)–(iii) (aggravated sexual assault);
*id.* § 21.11(a)(1), (c)(1) (indecency with child).

jury assessed appellant's punishment at confinement for life for each of the aggravated sexual assault offenses and twenty years' confinement for the indecency with a child offense. The trial court ordered the sentences for the aggravated sexual assault offenses to run concurrently and the sentence for the indecency with a child offense to run consecutively to the other four sentences. In his sole issue on appeal, appellant contends that the trial court erred by impermissibly allowing three outcry witnesses to testify.

We affirm.

## Background

Appellant is the stepfather of Alice, the complainant.[2] Alice was born in December 2001 and was sixteen years old at the time of trial. Appellant married Ellen, Alice's mother, in 2012. Appellant, Ellen, Alice, and Alice's half-sister Denise all lived together in Wichita Falls, Texas.[3] While at school on September 25, 2014, Alice disclosed to Wanda Williams, a teacher's aid, that appellant had sexually abused her.

---

[2] In this opinion, we use the pseudonym "Alice" to refer to the minor complainant, "Denise" to refer to her minor sister, and "Ellen" to refer to the girls' mother to protect their privacy.

[3] The Texas Supreme Court transferred this appeal from the Court of Appeals for the Second District of Texas to this Court pursuant to its docket-equalization authority. *See* TEX. GOV'T CODE ANN. § 73.001 ("The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer.").

*A. The Outcry Witness Hearing*

In a six count indictment, a grand jury charged appellant with four counts of aggravated sexual assault of a child and two counts of indecency with a child. Specifically, count one alleged that appellant intentionally and knowingly caused the penetration of Alice's sexual organ with his sexual organ; count two alleged that appellant intentionally and knowingly caused the penetration of Alice's sexual organ with his finger; count three alleged that appellant intentionally and knowingly caused Alice's sexual organ to contact his mouth; count four alleged that appellant intentionally or knowingly caused the penetration of Alice's mouth by his sexual organ; count five alleged that appellant, with the intent to arouse or gratify his sexual desire, caused Alice to engage in sexual contact by causing her breast to contact his mouth; and count six alleged that appellant, with the intent to arouse or gratify his sexual desire, engaged in sexual contact with Alice by touching her breast with his sexual organ.

The trial court held an outcry-witness hearing prior to the start of trial. At the beginning of the hearing, the State announced its intent to call two separate outcry witnesses: one outcry witness would address three of the counts against appellant, and the other outcry witness would address the remaining three counts. Cindy Underwood testified that she was the former assistant principal at an elementary school in Wichita Falls and that, on September 25, 2014, she had a conversation with

3

Alice, who was twelve at the time, concerning allegations of sexual abuse. Underwood testified that Wanda Williams, a paraprofessional at the school, had approached her and explained that Alice had disclosed that she was being abused by her stepfather. Williams did not tell Underwood whether Alice had disclosed details of the abuse to her. Underwood testified:

> [Alice] told me that when, um, her mom is either asleep or gone that her step-father [appellant] was doing inappropriate things to her. Um, said that—she said that he would suck on her chest, put his tongue inside her. Um, one time she—Or she told me that he, um—She didn't use the word "penetrate," but she said he tried to put his thing inside [her], but it hurt, so he stopped. She told me that he will, without any clothing on, shake in front of her. Also that, um—I guess he has her watch movies and tells her that's what she needs to do.

When asked whether Alice went into detail about the videos, Underwood stated, "I believe she said they were having sex."

Underwood testified that Alice did not use the word "vagina" when describing where appellant placed his tongue, but Alice pointed to that area of her body. Underwood also testified that she did not ask for clarification when Alice said appellant tried to put his "thing" inside her, believing it was "self-explanatory" that Alice was referring to appellant's penis. She stated that Alice was in fifth or sixth grade when this conversation occurred. Alice told Underwood that the abuse had been going on for about two-and-a-half years and that the last incident of abuse occurred approximately one week prior to their conversation. Alice identified appellant by name during this disclosure.

Shannon May conducted Alice's forensic interview at Patsy's House Children's Advocacy Center in Wichita Falls. May interviewed Alice on three occasions: September 26, 2014, October 21, 2014, and June 9, 2015. In the first interview:

> [Alice] talked about her stepdad, [appellant], but she also talked about it being—she also came in saying that she wanted to clear up that it was not him, that it was a nightmare, but the acts that she disclosed were that she had been touched on her vagina, that she had been made to suck on a private part, that, um, she had—that someone else's private part had touched her on her private areas.

In this interview, Alice described these acts as occurring in a dream, and she did not name appellant as the perpetrator. Alice provided May with sensory details concerning these acts, such as feeling pain when her vagina was penetrated, and she also stated, "Even if it was real, I don't want him going to jail; I like my mom happy."

In the second interview, in October 2014, Alice provided "a few different details, but she did talk about the same acts." May testified that Alice did not give any inconsistent details, but she no longer said that the abuse was just a dream. Instead, she said that she had been abused by a man named Andrew, who had been a former babysitter. Alice apologized to May for lying in the previous interview and said that she had been scared. Alice discussed her mother, Ellen, "telling her details about CPS and her trying to protect the family," and she said, "Dad [appellant] isn't going to be home for awhile until the investigation is done." She told May that appellant was not doing very well.

5

At the time of the third interview, in June 2015, Alice was no longer in her mother's custody. She gave consistent details regarding the acts that had been performed upon her, covering all six counts of the indictment against appellant, and she disclosed to May that appellant was the perpetrator. Alice told May that she had been misleading in her first two interviews. The prosecutor and May had the following exchange:

Q:     Did she [Alice] further describe telling [appellant] that she had informed other people [about the abuse] and his response to that?

A:     Yes.

Q:     And what did she tell you about her interaction with [appellant] after she disclosed to [appellant] that she had told someone?

A:     That he was attempting to abuse her again and she was moving away, or not wanting to do it, and then she told him that she had told her principal about what had happened, and he said, um, You've F'ed up my life. I told you not to say anything. I trusted you. You're—He also told her she's a part of this and she'll be in trouble with him.

Q:     Did he inform her that—According to [Alice], did [Alice] tell you that [appellant] informed her that she needed to make something up or lie about it to get both of them out of trouble?

A:     Yes.

Q:     And she—Did she disclose to you the manner in which she outcried first, briefly, to Wanda Williams and then to Cindy Underwood, her principal or assistant principal?

A:     Yes.

Q:     Did she tell you who gave her the idea to say it was a nightmare?

A:     Yes.

Q:     And was that [appellant]?

6

A: Uh, him and her mom together. They were together in a discussion early in the morning, was my understanding, when the nightmare theory came out.

Q: Did she give you an explanation why she decided to say it was Andrew?

A: Yes.

Q: Did she indicate to you that she thought that might help bring [appellant] home and make her mother happy?

A: Yes.

Alice told May that the abuse had been occurring for a couple of years, and she was able to describe to May the first instance of abuse. Alice described the acts of abuse that she participated in, she demonstrated her and appellant's relative positions during these acts, and she provided other sensory details to May.

Donnie Cavinder, an investigator with the Wichita County District Attorney's Office, testified that he was present for an interview with Wanda Williams. Williams indicated that although she was the first person Alice spoke to about the abuse, Alice did not provide substantive details about the abuse. Instead, Alice informed Williams that she had been sexually abused by appellant and Williams stopped the conversation and informed Underwood.

At the close of the hearing, the State informed the trial court that it intended to use Underwood as the outcry witness for counts one, three, and five of the indictment, and May as the outcry witness for counts two, four, and six of the indictment. Defense counsel made the following objection:

7

Judge, I have no objection to Ms. Underwood or the forensic interviews of Number One and Two [conducted by May]. My only objection is to Interview Number Three, and that's based on time. Whatever it is—One of the—The Court finds in a hearing conducted outside the presence of the jury that the statement is reliable based on time, content and circumstances of the statement.

[Alice] said the same things in an interview on September 26th and just reiterated it on June 9th, and so the time issue is my only objection, that it wasn't timely enough. It was nine months later.

Defense counsel also stated that, at the time of the June 2015 interview, Alice had been in CPS custody for six months "and told them what CPS wanted to hear." Counsel therefore objected to May's testimony concerning the June 2015 interview due to "the circumstances [of] being in CPS's care for six months and the time being nine months later." The trial court overruled defense counsel's objection and found that all of the outcry statements were reliable.

## B.    Trial Testimony

At trial, Williams testified that she worked as a teacher's aid at an elementary school in Wichita Falls.[4] On September 25, 2014, she had an encounter with Alice, who was in fifth grade. Williams had seen Alice playing on the playground, and her demeanor seemed normal. After the class came inside, the teacher and Williams

---

[4]    At a bench conference before Williams started testifying, defense counsel asked the State why Williams was testifying because counsel did not have her listed as an outcry witness. The State responded that Williams would testify about Alice's demeanor and that Alice's statement that her stepfather was touching her inappropriately would not be "offered for the truth of the matter asserted, but it goes to the information acted upon by Wanda Williams." Defense counsel did not object to calling Williams as a witness.

waited while the entire class took a bathroom break. All of the students eventually returned to the classroom, but Alice did not. Williams stepped inside the girls' bathroom and saw Alice, who had her hands over her face and was crying. When Williams asked what was wrong, Alice responded, "I'm embarrassed that, uh, I have to tell my mom something that, uh, is going to hurt her." After Williams reassured her, Alice stated that she "had been touched inappropriately by someone that was close to her mom," and Alice clarified that that person was her stepfather. Alice did not provide specific details concerning the abuse to Williams. Williams escorted Alice back to class and then spoke with Underwood, the school's assistant principal, about the conversation she had just had with Alice. Williams was not involved in any discussions between Underwood and Alice.

Underwood testified that she became involved when Williams approached her and informed her that Alice had disclosed sexual abuse by her stepfather. Williams did not provide Underwood with any details. Underwood brought Alice to her office to speak with her about the abuse. Underwood had the following exchange with the prosecutor concerning Alice's outcry:

Q:    What did she tell you?

A:    Um, a couple of specific details. [Alice] said that when her mom is either asleep or out of the house that her stepdad does things to her. Specifically, she said that he will put his tongue inside her. Um, she didn't use the word "vagina" or anything. At one point when she said inside her, she pointed down.

Q:    She pointed down?

9

A:     To, like, her private part, her vaginal area.

Q:     Thank you.

A:     She never used those words, though.

Q:     Okay. What else did she say?

A:     She said that he will suck on her chest. Um, he—She also said that he will take his clothes off and shake in front of her.

Q:     Did she describe or tell you what "shake" meant?

A:     No. I didn't pry. Um, she said that he will show her movies of people having sex and say that that's what she needs to do. At one point she told me that he tried to put his thing inside her. Those were the words she used. Um, but that, um, it hurt and so he stopped.

Underwood testified that Alice identified appellant by name.

Underwood knew that Alice had a younger sister at the school, Denise, and she asked Alice if appellant had done anything inappropriate to Denise. Alice said "basically, no way, that the sister would rat him out." Alice told Underwood that she did not want to tell her mother about the abuse because "her mother was happy right now." Alice also told Underwood that the abuse had been occurring for two-and-a-half years and that the last occurrence was approximately one week before her outcry. After her conversation with Alice, Underwood called Child Protective Services.

The next day, Underwood met with both Alice and Ellen. Ellen told Underwood "[t]hat this was all a dream, that [Alice] watches movies and that's why she was confused" and that Alice has a "wild imagination." When Alice spoke alone

10

with Underwood the day before, she had not mentioned anything about a dream. Underwood also testified that, when she spoke with Alice alone, Alice did not name any other person who was sexually abusing her, and she was consistent in naming appellant as the perpetrator.

Alice testified that she had been sexually abused during two different periods of her life. The first occurred when she was around five years old, and the perpetrator was her mother's uncle. The second period occurred when she was ten to twelve years old, and the perpetrator was appellant. Alice stated that appellant began sexually abusing her when she was ten years old and that the abuse began shortly after appellant married Ellen. Alice testified that appellant touched her vagina with his fingers and his mouth, touched her breasts with his hands and his mouth, made her touch his penis with her hands and her mouth, and made her watch pornographic videos. Alice also testified that appellant attempted vaginal intercourse with her, but Alice started crying and appellant stopped.

Alice testified that Williams was the first person she told about the abuse and that she spoke with another person at school—Underwood—that same day. Alice told Ellen about the abuse when she got home from school, but she did not feel as though Ellen believed her. Later, appellant walked into Alice's bedroom and showed her a pornographic video before starting to touch her vagina. Alice told appellant that she had disclosed the abuse, and appellant "freaked out" and told Alice that she

11

had "fucked up his life." Appellant then told Alice that she should "say it was a dream or lie about it." Alice told Ellen about appellant's actions that evening, and Ellen told Alice to go to bed. The next morning, Ellen woke Alice up and had a conversation with her and appellant. Ellen asked Alice if appellant had actually touched her, and Alice said "no." Alice testified that she said no because appellant "was right in the room and [she] was scared of what was going to happen." Alice remembered appellant and Ellen saying "it was probably a dream." Alice went to school that day and told a counselor that the abuse had occurred in a dream. Alice testified that the acts that she described in her first forensic interview were true; what was not true was that the acts had only happened in a dream. Alice also testified that Ellen told her to say that a former babysitter named Andrew was the person who abused her, and Alice did this so appellant would return to the house. She testified that Andrew never sexually abused her.[5]

May testified that she first interviewed Alice on September 26, 2014. In this interview, Alice immediately told May that earlier that morning, she had a conversation with Ellen and appellant "about that she was not sexually abused."

---

[5] Andrew, a former friend of Ellen and Ellen's ex-husband, testified that he used to babysit Alice and Denise during 2011 and 2012. He unequivocally denied ever sexually abusing Alice.

12

Alice told May that "her mom had told her it was a nightmare."[6] May testified that Alice understood the distinction between a truth and a lie, and the State asked May how the interview "progress[ed] from that point." At this point, defense counsel argued that the best evidence of the interviews was the recordings of the interviews themselves, not May's testimony. Defense counsel stated that he had no objection to the admission of the recordings of the forensic interviews "[o]ther than [his] objection that was made outside the presence of the jury." The trial court therefore admitted the video recordings from May's September 2014, October 2014, and June 2015 forensic interviews with Alice.

After the jury had watched the recordings of all three forensic interviews, the State asked May whether she heard from Alice "any inconsistent sensory details regarding the acts of abuse," and May responded that she had not. May also testified that although Alice occasionally described things in terms of "he would always do this" or "it would happen this way," she was also able to provide specific details, such as the particular act appellant wanted her to perform or the fact that one instance occurred in her mother's bathroom. May testified that she did not consider this to be

---

[6] Amber Chancellor, a sexual assault nurse examiner, conducted Alice's medical examination on September 26, 2014, the day after Alice made her outcry to Underwood. During the exam, Alice told Chancellor that she had a nightmare in which appellant sexually abused her, and she described the abuse in detail. At one point Alice told Chancellor, "I thought it was real, but, apparently, it's not because he would never do that."

a situation in which Alice recanted her allegations of abuse. May testified: "[S]he never recants the abuse. She changes what she says about it or her—why she says she told it, but she never recants that she was sexually abused. She never takes that back."

The jury found appellant guilty of all four counts of aggravated sexual assault of a child and one count of indecency with a child. The jury acquitted appellant of the other indecency with a child charge. The jury assessed appellant's punishment at confinement for life for each of the four aggravated sexual assault of a child charges and twenty years' confinement for the indecency with a child offense. The trial court ordered the sentences for the aggravated sexual assault of a child offenses to run concurrently and the sentence for the indecency with a child offense to run consecutively to the other sentences. This appeal followed.

## Outcry Witness Testimony

In his sole issue, appellant contends that the trial court erred by allowing three witnesses—Williams, Underwood, and May—to serve as outcry witnesses.

### A. *Standard of Review and Governing Law*

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d). Generally, hearsay is not admissible in evidence unless provided for by the Rules of Evidence, by statute, or by another rule. TEX. R. EVID. 802.

One recognized exception to the hearsay rule is Code of Criminal Procedure article 38.072, which provides that, in cases involving certain sexual offenses committed against children, the trial court may admit a child's out-of-court statement concerning the sexual abuse made to an outcry witness. *See Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011). Article 38.072 applies to out-of-court statements by a child complainant that (1) describe the alleged offense; (2) were made by the child against whom the charged offense was allegedly committed; and (3) were made to the first person, age eighteen or older, other than the defendant, to whom the child made a statement about the offense. TEX. CODE CRIM. PROC. ANN. art. 38.072 § 2(a); *Sanchez*, 354 S.W.3d at 484. Article 38.072 also contains procedural requirements that must be met for the child's statement to an outcry witness to be admissible. TEX. CODE CRIM. PROC. ANN. art. 38.072 § 2(b). At least fourteen days before the proceeding begins, the party intending to offer the statement must notify the adverse party of its intention to do so, provide the name of the witness through whom the party intends to offer the statement, and provide a written summary of the statement. *Id.* § 2(b)(1). The trial court must hold a hearing outside the presence of the jury and determine that the statement is reliable based on the time, content, and circumstances of the statement. *Id.* § 2(b)(2). Finally, the child complainant must testify or be available to testify at the proceeding. *Id.* § 2(b)(3); *Sanchez*, 354 S.W.3d at 484.

15

For a child's out-of-court statement to qualify as an outcry statement, the statement must be "more than words which give a general allusion that something in the area of child abuse is going on." *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)); *Rosales v. State*, 548 S.W.3d 796, 806 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). An outcry witness designation is event-specific, not person-specific. *Lopez*, 343 S.W.3d at 140; *Rosales*, 548 S.W.3d at 806–07. Hearsay testimony from more than one outcry witness may be admissible only if the outcry witnesses testify concerning different events. *Lopez*, 343 S.W.3d at 140; *see Rosales*, 548 S.W.3d at 807 ("More than one outcry witness may testify if each witness testifies regarding different events."); *Polk v. State*, 367 S.W.3d 449, 453 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) ("More than one outcry witness may testify when the outcry statements are about differing events and not a repetition of the same events."). "There may only be one outcry witness per event." *Lopez*, 343 S.W.3d at 140.

The trial court has broad discretion to determine which of several witnesses is an outcry witness, and we will not disturb this decision absent a clear abuse of discretion. *Chapman v. State*, 150 S.W.3d 809, 813 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). A trial court abuses its discretion when its decision is outside the zone of reasonable disagreement. *Id.*; *see Rosales*, 548 S.W.3d at 807–08

(holding that trial court did not abuse its discretion by designating child's mother as proper outcry witness).

## B.    *Preservation of Error*

As an initial matter, the State contends that we need not reach the merits of appellant's complaint because appellant failed to preserve this issue for appellate review. Specifically, the State argues that, at the hearing to designate the proper outcry witness, appellant did not object to allowing the testimony of both Underwood and May on the basis that the State sought to improperly designate multiple outcry witnesses. We agree with the State that appellant did not preserve his complaint for appellate review.

Generally, to preserve a complaint for appellate review, the record must show that the complaining party made his complaint to the trial court by timely request, objection, or motion that stated the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a)(1); *Gibson v. State*, 541 S.W.3d 164, 166 (Tex. Crim. App. 2017); *see also Rosas v. State*, 76 S.W.3d 771, 776–77 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding that when State offers child's out-of-court outcry statement under article 38.072, defendant must object to statement to preserve complaint about statement for appellate review). Although the Rules of Appellate Procedure do not require "hyper-technical or formalistic use of words or phrases" to preserve error, the

17

objecting party must still let the trial court know what he wants and why he thinks he is entitled to it, and the party must "do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (quoting *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009)). The complaint on appeal must comport with the objection made at trial. *Id.*; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

Here, prior to the start of trial, the trial court held a hearing outside the presence of the jury to determine the proper outcry witnesses pursuant to article 38.072. To the extent appellant contends Williams improperly served as an outcry witness, we note that the State did not designate Williams as an outcry witness, and Williams did not testify at the pretrial hearing. At trial, when the State called Williams as a witness, defense counsel asked the State at a bench conference why Williams was testifying, pointing out that the State had not designated her as an outcry witness. The State responded that it was calling Williams as a witness to testify concerning Alice's demeanor during their conversation on September 25, 2014, and that it was offering Williams' testimony not for the truth of the matter asserted but because "it goes to the information acted upon by Wanda Williams."

Defense counsel did not, at any point in the proceedings, object to Williams' testimony on the basis that she was improperly serving as an outcry witness.[7]

At the outcry-witness hearing, the State called Underwood, who spoke with Alice immediately after she made her disclosure of sexual abuse to Williams, and May, who conducted three forensic interviews with Alice occurring in September 2014, October 2014, and June 2015. Both witnesses testified concerning the statements that Alice made to them. At the close of the hearing, the State argued that both Underwood and May were proper outcry witnesses because appellant had been indicted for six different sexual offenses and Underwood's testimony was relevant to three specific counts, while May's testimony was relevant to the three other counts. Defense counsel did not object on the basis that the State could not have

---

[7] During Williams' testimony at trial, the State asked Williams, "What did she [Alice] tell you was wrong?" Defense counsel objected on the basis of hearsay. The State responded, "Judge, I'm not offering it for the truth of the matter asserted. It's the information relayed to Ms. Williams that is acted upon by Ms. Williams." The trial court overruled the objection, and Williams stated, "She said, I'm embarrassed that, uh, I have to tell my mom something that, uh, is going to hurt her." Williams later testified, without objection, that Alice said "she had been touched inappropriately by someone that was close to her mom" and that Alice identified her stepfather as the perpetrator. Williams stated that Alice told her no details of the abuse. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a) (providing that outcry statement must "describe the alleged offense"); *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (stating that outcry statement "must be 'more than words which give a general allusion that something in the area of child abuse is going on'") (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)); *see Rosales v. State*, 548 S.W.3d 796, 807 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (stating that child's aunt was not proper outcry witness because, while aunt was first person child spoke to, child told aunt only that defendant had "touched her the wrong way," and this was "no more than a general allusion that abuse had occurred").

multiple outcry witnesses. Indeed, defense counsel did not object to May's testimony concerning the first two forensic interviews with Alice that occurred in September 2014 and October 2014. Instead, defense counsel's only objection was to May's testimony concerning her third forensic interview with Alice—occurring in June 2015—and counsel's basis for this objection was that, due to the passage of time from the initial outcry and the fact that Alice was no longer living in her mother Ellen's custody at the time of the third interview, the third interview was not reliable.[8] *See, e.g.*, *Sanchez*, 354 S.W.3d at 484–85, 488 ("The only task [article 38.072] assigns the trial court is to determine whether, based on the time, content, and circumstances of the statement, the outcry is reliable.").

Appellant did not object on the basis that the State had improperly designated multiple outcry witnesses or that Underwood's testimony and May's testimony concerning Alice's outcry statements impermissibly covered the same events. He objected only that May's third forensic interview with Alice was inadmissible because it occurred months after Alice's initial outcry and, therefore, was not reliable. Appellant's complaint on appeal does not comport with the objection that

---

[8]    At trial, defense counsel argued that the video recordings of May's forensic interviews with Alice were the best evidence of what occurred during the interviews, rather than May's testimony concerning the interviews, and he requested that the trial court admit the recordings of the interviews. Defense counsel stated that he had no objection to admission of the recordings "[o]ther than [his] objection [to the June 2015 interview] that was made outside the presence of the jury."

20

he raised at trial. *See Clark*, 365 S.W.3d at 339. We agree with the State and hold that appellant failed to preserve for appellate review his complaint that the trial court improperly allowed the testimony of multiple outcry witnesses.

We overrule appellant's sole issue on appeal.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Kelly.

Do not publish. TEX. R. APP. P. 47.2(b).