

# NUMBER 13-18-00493-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ROBERT ELLIS BATES,                                               Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

### On appeal from the 25th District Court
### of Gonzales County, Texas.

# MEMORANDUM OPINION
### Before Justices Benavides, Perkes, and Tijerina
### Memorandum Opinion by Justice Benavides

By two issues, appellant Robert Ellis Bates challenges his conviction for

aggravated sexual assault of a child, M.M.[1]  *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B).

Bates first challenges the admissibility of the child's outcry statement to her mother, and

---

[1] To protect the identity of the minor child, we refer to her and her mother by their initials. *See* TEX. R. APP. P. 9.8.

next challenges the sufficiency of the evidence to support his conviction. We affirm.

## I. BACKGROUND

Bates moved back to Gonzales in 2015 and regularly visited his former wife Laurie Lee, especially during the day. Lee regularly babysat M.M. from the time she was six or eight months old until October 2016 when M.M. was three years old. Lee had an adopted son, J.L. who was aged seven in 2016. Lee also baby-sat other children, but not as regularly as M.M.

Lee testified at trial that Bates knew M.M. When he was there, he played with her like he did with Lee's granddaughter who was the same age, and with J.L. One of their games was the pull-up-shirt game where he would pull his shirt up over his belly and then the child would pull it back down. He would give the children horsey rides on his knee, watch TV with the children, and sometimes take them to the park across the street from Lee's apartment. M.M. liked Bates according to Lee; M.M. called him Robert.

In late September 2016, M.M. was in the bathroom by herself when she began screaming. Lee ran into the bathroom to see what was wrong and M.M. yelled, "Ms. Laurie, get it out, get it out." M.M. was urinating and it hurt. Lee told A.L., M.M.'s mother. Later that night, M.M. did not have pain while urinating according to her mother. A.L. testified that she thinks that Lee told her about M.M.'s painful urination on about October first.

On October 4, 2016, A.L. testified that M.M. made an outcry to her. M.M. was on the toilet, A.L. was in the bathroom with her and M.M. told her that "Robert was in my panties." M.M. opened her "privates" and told her mother that Robert had given her an

2

"owie."

A.L. testified that she called her father, and then called M.M.'s primary care physician and took her to the doctor's office. M.M. had been seeing the physician's assistant (PA) there since she was an infant. M.M. explained to the PA what happened to her. A.L. then called the local police on the PA's recommendation. At the time of trial, the PA was deceased, but M.M.'s medical records were admitted.

Looking back, A.L. testified that in late September 2016, M.M. did not like to be dropped off at Lee's, she screamed when A.L. dropped her off, and M.M. did not like to be around men. At the time, A.L. thought it was just separation anxiety because she was working more hours. Since October 2016, M.M.'s separation anxiety has worsened. She is particularly fearful of men she does not know but loves her step-father Travis.

During August through early October 2016, A.L. testified that the only person who kept M.M. was Lee. Travis, A.L.'s then-boyfriend and now husband, was working and living in Victoria with his parents. When A.L. and M.M. were in Victoria, Travis's mother kept M.M. if necessary. A.L. was living with her father who never kept M.M. when she was working.

M.M. was five years old at time of trial. She testified very briefly but she did not want to be there and did not want to talk about the events. She testified she knew she was there to talk about Robert who is a "bad guy." When she was asked, "And what did he do to M.M. that makes him a bad guy?" She responded, "Nothing." When the prosecutor asked M.M., "Did somebody touch you somewhere they weren't supposed to touch you at Laurie Lee's house?" M.M answered, "Nope." The prosecutor asked M.M. to

3

identify body parts on a drawing, eyes, hair, legs, and a part that M.M. referred to as her "kitty."

Q. . . . Has something ever happened to your kitty?

A. (No audible response.)

Q. Is that the truth or is it something you just don't want to talk about right now?

A. I don't want to talk about it right now.

Q. Okay. You don't want to talk about it right now? How come you don't want to talk about it right now?

A. Because I don't like it.

Q. Because you don't like it? Okay. And why don't you like it?

After further questions, M.M. testified she was scared and nervous and she did not want to talk about it at all.

Investigator Jason Montoya with the City of Gonzales investigated M.M.'s outcry. He conducted interviews with Lee, Bates, and coordinated M.M.'s examination with the Sexual Assault Nurse Examiner (SANE). Montoya testified that he first interviewed Lee on October 5, 2016, and that he did not tell her the purpose of the interview. He noticed that Lee was protective of Bates. Lee told him that Bates was never alone with M.M., that he was never in the bathroom with her, and that he came over daily usually in the middle of the day and did not spend the night. Lee also told Montoya that she saw her son J.L. in the bathroom with M.M. After telling Montoya that M.M. was constantly at her side when Bates was at her house, Lee acknowledged that Bates and M.M. played while she was cooking. She described her activities with M.M. as painting, watching TV, going to town,

4

and going to the park. The last time M.M. was with Lee, it was late in the evening when Travis picked her up and everything was fine. Montoya asked Lee not to mention the interview to Bates.

Montoya next attempted to interview Bates at work. His car was there, but he was not. Another driver called to say he was bringing Bates into work, but instead Bates had the driver drop him off at home. Montoya concluded that Bates was avoiding him. Bates came into the police station later and spoke to Montoya. Bates admitted he had spoken to Lee but refused to discuss the content of their conversation. Bates began the interview by flatly stating he was never alone with M.M. He admitted that he had known M.M. since she was very young, he used her nickname, and described the things they did at Lee's: ate ice cream, she sat on his lap, and they watched TV. Once Montoya told him the details of the allegation, Bates began to refer to M.M. as "that child." At one point Bates stated he never changed her diaper, never took M.M. to the bathroom, and that he would never put himself in a position to be accused. Montoya thought the statement was very odd.

Lee contacted Montoya two days later and came into the station where he did a second interview with her. During that interview, Lee told Montoya that M.M. acted scared of Travis when he picked her up that last time and she never had before. Lee was concerned and intended to mention it to A.L.

Montoya had a second interview with Bates in which he admitted he took M.M. to the park and had been alone with her several times. Montoya also interviewed Travis, A.L.'s boyfriend, who denied ever having touched M.M. inappropriately. Nothing about his interview seemed "off" to Montoya. He did not further investigate Travis.

Allyson Cordoni, the SANE, testified regarding her examination and M.M.'s history. She saw M.M. twice; the first time on October 5, 2016. A.L. provided the initial history, but after the examination, Cordoni asked M.M. again if she had any "owies," M.M. responded: "yes and shook her head." M.M. told Cordoni:

> She had told me—I said—she had owies. I asked her where, and she pointed to her vaginal area, and I said "What happened?" And she said, "Robert hurt me." And . . . then I asked her . . .what he hurt her with, and she held up her hand, and then I held up my hand and said, "With this?" I held up both hands, I think. And she said, "Yes, just with this hand." And so then I started wiggling my fingers to see, "With these?" And she said, "Yes, with that one." And then she pointed to the index finger and said he hurt her with that finger.

M.M. explained that the event happened at Miss Laurie's. During her physical examination of M.M. Cordoni found a red and white scar at the posterior fourchette and extending into her perineum at the six o'clock position that could have caused the pain on urination a few days before. That kind of injury heals quickly according to Cordoni and is also consistent with digital penetration. When M.M. returned six weeks later, she was more relaxed and seemed happier.

Martina Scott, a child-care licensing inspector with the Health and Human Services Commission investigated Lee for operating an unlicensed day care facility and in doing so also investigated the allegations against Bates. She interviewed M.M., Lee, and Bates. She noted numerous inconsistencies in Bates's and Lee's statements regarding the nature and frequency of his interaction with M.M. M.M. was initially wary of Scott, but slowly warmed up to her. But "once Robert was brought up, the best way I can describe it is she went ghost face, was way more reserved, hiding in her mom's, you know, shirt, did not want to talk about—about Robert.""

The jury was charged on aggravated sexual assault of a child, and indecency with a child. The jury convicted him of aggravated sexual assault of a child. After a separate punishment hearing, the trial court sentenced Bates to thirty years' imprisonment in the Texas Department of Corrections–Institutional Division.

## II. DISCUSSION

By two issues, Bates challenges his conviction. Bates first challenges the admissibility of the outcry statement. He argues that the proper outcry witness was the SANE nurse not the child's mother and that the mother's hearsay testimony should have been excluded. Bates next argues that the evidence of penetration is insufficient to support his conviction for aggravated sexual assault of a child.

### A. Admissibility of Outcry Statement

#### 1. Standard of Review and Applicable Law

A child's out-of-court statements regarding sexual abuse allegations is commonly referred to as an "outcry," and an adult who testifies about the outcry is commonly referred to as an "outcry witness." *Sanchez v. State*, 354 S.W.3d 476, 484–85 (Tex. Crim. App. 2011); *see also Morin v. State*, No. 13-18-00149-CR, 2020 WL 582157, at *3 (Tex. App.—Corpus Christi–Edinburg Feb. 6, 2020, no pet. h.). Admissibility of an outcry statement is governed by statute. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072. Under article 38.072, for a trial court to admit outcry witness testimony, it must hold a hearing "outside the presence of the jury" and make the determination that "the [child's outcry] statement is reliable based on the time, content, and circumstances of the statement." *Id.* Article 38.072 only applies to statements that (1) "describe the alleged offense," (2) "were made

7

by the child . . . against whom the charged offense was allegedly committed," and (3) "were made to the first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense or extraneous crime, wrong, or act." *Id.*

According to the court of criminal appeals, the outcry witness under this statute is the first adult to whom the child makes a statement that "in some discernible manner describes the alleged offense." *Reed v. State,* 974 S.W.2d 838, 841 (Tex. App.—San Antonio 1998, pet. ref'd) (citing *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)). The statement must be more than a general allegation of sexual abuse. *Garcia*, 792 S.W.2d at 91. We review the trial court's decision on admissibility for an abuse of discretion. *Id.* We will uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Robinett v. State*, 383 S.W.3d 758, 761 (Tex. App.—Amarillo 2012, no pet.).

### 2. Discussion

A.L. testified during the outcry hearing as follows:

I took her to the bathroom, like normal, and she sat on the toilet, and she—she told me, she goes—she goes, "Robert was in my panties," and I was like, huh? And she said, "yeah"—she said it real fast, but she said he—he was in my panties, and then he was—[J.L.] was outside, and he said, "Shhh, shhh, don't say anything, don't say anything," and I was like okay.

Q. And when she said he was in her panties, did she make any indication or show you on her body what she was talking about?

A. Yeah, she reached down and opened and she pointed.

Q. When you say "opened"—

A. She opened her privates. And pointed right there and said I have an owie.

8

Q. . . . .[D]id she tell you who had given her the owie?

A. Yeah, she said Robert did.

Q. And you say that earlier that J.L. was outside. Do you know who she's referring to when she says J.L.?

A. Yes, that was Laurie's adopted son, the babysitter's adopted son.

Q. And was there anybody else in M.M.'s life that she referred to as Robert?

A. No, we don't know any other Roberts.

Q. And is that how she did, in fact, refer to the defendant was as Robert?

A. Uh-huh.

 . . . .

A. Yeah, she said it hurt, she said it was like a bee sting, yeah.

The trial court ruled that A.L. was qualified to testify as an outcry witness over the defense objection.[2]

Bates argues that the outcry witness must have knowledge of more than a "general allusion to something in the area of child abuse was going on." The State argues that Bates failed to preserve any objection. Assuming the issue is preserved, we note that the case law requires that the outcry witness be told the who, what, and where of the abuse, considering the communication abilities of the child. In *Reed*, the San Antonio court held that the father was the proper outcry witness where children reported to him what, where, and when the abuse took place, even though a later interviewer obtained more detail. *See* 974 S.W.2d at 841. Here, the three-year-old M.M. told her mother that Robert caused

---

[2] Defense counsel objected as follows:

Some of the factors used in the outcry statement, Your Honor, are is the child being able to testify at trial and as to making the statement, that the child has an understanding about the truth and being able to tell the truth. Both of those things are lacking here, Judge, this may be a little premature to allow this hearsay statement in until we do hear from the child.

an injury inside her private by showing her, explained that it hurt like a bee sting, and that the injury happened at Ms. Laurie's. The trial court did not abuse its discretion by admitting A.L.'s testimony. *See id*,

We overrule Bates's first issue.

## B.    Sufficiency of the Evidence

### 1.   Standard of Review

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *In re Winship*, 397 U.S. 358, 361 (1970)). We apply the sufficiency standard from *Jackson*, which requires the reviewing court to "view[] the evidence in the light most favorable to the prosecution," to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 319). When a reviewing court views the evidence in the light most favorable to the verdict, it "is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. If the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the prosecution and defer to that resolution. *Garcia v. State*, 367 S.W.3d 684, 686–87 (Tex. Crim. App. 2012); *Brooks*, 323 S.W.3d at

10

899.

"Constitutional review of the sufficiency of the evidence is measured against the elements of the criminal offense as defined by state law." *Fuller v.* State, 73 S.W.3d 250, 253 (Tex. Crim. App. 2002) (citing *Jackson*, 443 U.S. at 324 n.16). However, review of the "sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Garcia*, 367 S.W.3d at 687 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

## 2. Discussion

Bates argues that the element of penetration was not proven. But he concedes that the evidence is sufficient to prove aggravated sexual assault by contact which does not carry the twenty-five year minimum sentence applicable to penetration. He relies on the SANE Nurse Cardoni's answer to a single question that the scar could be consistent with touching for his argument that the evidence is insufficient to prove penetration.

The jury was instructed that to find Bates guilty of aggravated sexual assault of a child they must agree that he penetrated M.M.'s sexual organ with his finger and that M.M. was a child under six years of age. The evidence in support of the jury's finding of penetration consisted of A.L.'s outcry testimony, the SANE nurse's testimony, and documented location of the healing or healed scar. The State may also prove penetration by circumstantial evidence. *Villalon v. State*, 791 S.W.2d 130, 133 (Tex. Crim. App. 1990). The victim need not testify as to penetration. *Id.* Evidence of the slightest penetration is sufficient to uphold a conviction, so long as it has been shown beyond a reasonable doubt. *Luna v. State*, 515 S.W.2d 271, 273 (Tex. Crim. App. 1974); *Rodriguez v. State*, 762

11

S.W.2d 727, 732 (Tex. App.—San Antonio 1988), *pet. dism'd as improvidently granted*, 815 S.W.2d 666 (Tex. Crim. App. 1991). In *Vernon v. State*, the Court of Criminal Appeals determined what constitutes a "penetration" for purposes of aggravated sexual assault:

> [M]ere contact with the outside of an object does not amount to penetration of it. But pushing aside and reaching beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact. Consequently, it is not ungrammatical to describe Appellant's touching of complainant in this case as a penetration.

841 S.W.2d 407, 409 (Tex. Crim. App. 1992). Outcry testimony alone can be sufficient to sustain a conviction for aggravated sexual assault. *See Rodriguez v. State*, 819 S.W.2d 871, 873–74 (Tex. Crim. App. 1991); *Kimberlin v. State*, 877 S.W.2d 828, 831–32 (Tex. App.—Fort Worth 1994, pet. ref'd). Even if the victim recants or denies her outcry statements when testifying at trial, the jury is free to disbelieve the victim's recantation and credit her previous statements. *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)); *see also Flores v. State*, No. 13-12-00362-CR, 2013 WL 3326982, at *3 (Tex. App.—Corpus Christ–Edinburg June 27, 2013, no pet.) (mem. op., not designated for publication).

The anatomy lesson that accompanied Cardoni's testimony included her description of the outer vulvar wall, the inner vulvar walls, the posterior fourchette, and the fossa navicularis. The posterior fourchette and fossa navicularis, both of which had trauma, are generally not exposed to view, even in nakedness.

Based upon the evidence here, the jury was free to credit the evidence before them. The evidence is legally sufficient to support the judgment. *See Vernon*, 841 S.W.2d at 409.

Bates's second issue is overruled.

### III.    CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
30th day of April, 2020.