# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00078-CR

### Jose Rodriguez-Navarette, Appellant

### v.

### The State of Texas, Appellee

### FROM THE 167TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-18-301179, THE HONORABLE P. DAVID WAHLBERG, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Jose Rodriguez-Navarette was convicted by a jury of continuous sexual abuse of a child and indecency with a child by sexual contact. *See* Tex. Penal Code §§ 21.02(b), 21.11(a). The trial court sentenced appellant to thirty years' confinement and ten years' confinement, respectively, and ordered that the sentences run concurrently. In his sole point of error, appellant contends that the trial court abused its discretion by finding that forensic interviewer Grace Moon was the proper outcry witness for the third incident of abuse alleged to have occurred between appellant and the complainant, GFP.[1] We will modify the judgments to correct a clerical error and affirm the judgments of conviction as modified.

---

[1] Because the complainant is a minor, we will refer to her by her initials in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

## I.  Proper Outcry Witness

Article 38.072 of the Texas Code of Criminal Procedure, the outcry statute, governs the admissibility of certain hearsay evidence in trials for specified crimes against a child younger than fourteen years old.  *See* Tex. Code Crim. Proc. art. 38.072.  The statute creates a hearsay exception and allows testimony of the first adult in whom a child confides regarding sexual or physical abuse.  *See id.* at 38.072 § 2(a)(3); *Martinez v. State*, 178 S.W.3d 806, 810–11 (Tex. Crim. App. 2005).  The child's statement to the adult is commonly known as the "outcry," and the adult who testifies about the outcry is commonly known as the "outcry witness." *Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011).  The Texas Court of Criminal Appeals has explained that under Article 38.072, the proper outcry witness is the first adult person to whom the child describes the alleged offense in some discernible manner beyond general insinuations that sexual abuse occurred.  *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011); *see Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) ("[T]he statement must be more than words [that] give a general allusion that something in the area of child abuse was going on."); *see also Reyes v. State*, 274 S.W.3d 724, 727 (Tex. App.—San Antonio 2008, pet. ref'd) ("Simply put, the outcry witness is the first adult to whom the child tells 'how, when, and where' of the assault.").  However, the proper outcry witness is not

---

**2**  Because the parties are familiar with the facts of the case, its procedural history, and the evidence adduced at trial, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it.  *See* Tex. R. App. P. 47.1, 47.4.

determined merely by comparing the statements the child gave to different individuals and then deciding which person received the most detailed statement about the offense. *See Thomas v. State*, 1 S.W.3d 138, 141 (Tex. App.—Texarkana 1999, pet. ref'd). Rather, the victim must describe the offense to the witness. *Garcia*, 792 S.W.2d at 91.

In cases where a child has been victim of more than one instance of sexual assault, multiple outcry witnesses may testify about separate acts of abuse committed by the defendant against the child, but there may be only one outcry witness per event. *Lopez*, 343 S.W.3d at 140 (citing *Broderick v. State*, 35 S.W.3d 67, 73–74 (Tex. App.—Texarkana 2000, pet. ref'd)); *see In re C.E.S.*, 400 S.W.3d 187, 192 (Tex. App.—El Paso 2013, no pet.) ("Outcry testimony is event-specific not person-specific and, as such, multiple outcry witnesses may testify when the outcry statements are about different events and not a repetition of the same events.").

The trial court has "broad discretion" in determining the admissibility of outcry evidence. *Garcia*, 792 S.W.2d at 92; *see Foreman v. State*, 995 S.W.2d 854, 859 (Tex. App.—Austin 1999, pet. ref'd) (noting that prior cases "establish the difficulty that can arise in identifying the proper outcry witness, and the broad discretion of district courts in making this determination"). We review a trial court's ruling on the designation of an outcry witness for an abuse of discretion. *Garcia*, 792 S.W.2d at 92. A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). We will not reverse a trial court's ruling if it was "within the zone of reasonable disagreement," *id*. at 391 (on reh'g), and we must uphold the

3

ruling "if it is reasonably supported by the record and is correct under any theory of law applicable to the case," *Brito Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

Appellant was indicted on one count of continuous sexual abuse of a child, three counts of aggravated sexual assault of a child, and four counts of indecency with a child by sexual contact.[3] The charge of continuous sexual abuse of a child alleged in relevant part that appellant, "on or about February 21, 2018 through April 5, 2018, . . . during a period that was 30 days or more in duration, . . . committed two or more acts of sexual abuse" against GFP, including aggravated sexual assault and indecency with a child.[4] The State abandoned one of the counts of indecency during the charge conference, and the jury subsequently found appellant guilty of continuous sexual abuse of a child and two counts of indecency with a child by sexual contact. However, the trial court reformed the judgment and deleted one of the counts of

---

[3] GFP was eleven years old at the time of the offenses.

[4] The charge of continuous sexual abuse of a child alleged the following violations:

Aggravated sexual assault under section 22.021, namely, did then and there, intentionally and knowingly cause the penetration of the sexual organ of [GFP], by the sexual organ of the Defendant;

AND/OR
Aggravated sexual assault under section 22.021, namely, did then and there, intentionally and knowingly cause the sexual organ of [GFP], to contact the mouth of the Defendant;

AND/OR
Indecency with a child under section 21.11 (a)(1), namely, with the intent to arouse and gratify the sexual desire of JOSE RODRIGUEZ-NAVARRETE, engage in sexual contact with [GFP], by touching the genitals of [GFP].

indecency because it was a lesser-included offense of continuous sexual abuse and therefore subsumed by it.

The ultimate ruling serving as the basis for the present appeal is the result of two outcry hearings conducted on separate dates. The first occurred at an earlier trial that resulted in a mistrial. The transcript from that hearing was admitted into evidence during the second hearing, on October 21, 2019.[5] The circumstances underlying GFP's disclosures of abuse were established through witness testimony presented during the first hearing.

The first adult to whom GFP made an allegation of abuse was her school's social worker, Calisson Keating, on April 18, 2018. However, at the first outcry hearing, both sides agreed that, due to the perfunctory nature of the allegation, Keating was not the appropriate outcry witness.

According to her testimony at that hearing, Keating reported the allegation to the Austin Police Department ("APD"), and Officer Vaneza Bremner met with GFP and her mother, Yasmin, at the school. Bremner—whom appellant argued at the hearing should be the sole or principal outcry witness—described her role as to extract "the most basic information, to be able to provide that information to detectives so they can determine what their next steps are." In the approximately 13-minute interview between GFP and Bremner, GFP briefly described three incidents of abuse, about which Bremner testified at the first outcry hearing. At first, GFP was "kind of vague," and Bremner had to "bring it out of her." GFP told Bremner that on three

---

[5] No witnesses testified at the second hearing.

occasions, she had been taken to a hotel room in Austin near Capital Plaza by her "Aunt Maria."[6] On the first occasion, "a man" had touched GFP over her clothing in her "private area." On the second occasion, she was kissed but did not specify where on her body. The third time, GFP "stated that the suspect sexually assaulted her."

Bremner testified that with respect to the third incident, she and GFP "got a little bit more into it," and GFP told her that Maria had claimed that she was taking GFP to the hotel to watch Maria's two-year-old daughter. GFP detailed the clothes she was wearing, how her clothing was removed and put back on, and who else was in the room during the assault. GFP spelled out "s-e-x" and clarified that it meant "dick to vagina." She also discussed "how many times" it occurred. When asked who else was in the room during the assault, GFP told Bremner that her "Aunt Maria" and "Uncle Jose," as well as Maria's young daughter, were present. GFP explained that the assault hurt "like up near her ribs." She also stated that she had witnessed Maria and appellant having intercourse while she and Maria's daughter were in the room.

Although GFP told Bremner that one of the incidents had taken approximately three hours, she did not otherwise discuss a time frame for the incidents with her. Bremner learned from Keating that GFP had informed the social worker that two of the incidents occurred

---

[6] Maria Miranda-Aguirre was a friend of Yasmin's and a co-defendant in the case. At the time of the offenses, Maria shared an apartment with Yasmin, GFP, GFP's siblings, and Maria's husband and children. Maria did not testify at appellant's trial.

in February and one in March.[7] GFP did not mention breast-touching, breast-kissing, or oral sex in her statement to Bremner.

Following her disclosures to Keating and Bremner, GFP made her third disclosure to Grace Moon, a forensic interviewer with the Center for Child Protection. Moon also testified at the first outcry hearing. According to Moon, GFP claimed that she "didn't remember" why she was there. But when asked if anything else had happened that she wanted to talk about, GFP answered "in a very long narrative form." The interview took approximately two hours and three minutes.

In her narrative response to Moon, which Moon related in her testimony at the first hearing, GFP stated that her "tía's[8] lover" had sexually abused, "touched," and done "inappropriate" things to her. She said that Maria had taken her from school to the Super 8 hotel and had sex with appellant while GFP was in the room with "her little cousins"—Maria's two young children. While in the bathroom on her phone, GFP heard appellant ask Maria if GFP was "going to let herself get touched," and Maria said yes. Appellant and Maria called GFP over and asked GFP if she was going to let herself get touched. GFP did not know how to respond and

---

[7] Bremner's supplemental report noted that GFP had stated that "the first time in February, Jose touched her in her private area above her clothing." However, the report did not specify whether Bremner had received this information directly from GFP.

[8] "Tía" is Spanish for aunt. *Tía*, SpanishDict.com, https://www.spanishdict.com/translate/tia (last visited January 20, 2022). Elsewhere, GFP defined "tía" as "[s]omeone who has always been there and ha[s] supported you." Moon explained that GFP called Maria her tía and appellant her tía's lover.

remained silent. Maria looked at her "as if to say yes, say yes," and appellant began to touch GFP "inside her shorts and her titties." GFP told Moon that the abuse occurred three times.

Following her recitation of the narrative, Moon testified that she questioned GFP, going through the "acts and incidents one by one."[9] Recounting GFP's answers, Moon testified that Maria picked GFP up from school and took her home, where GFP changed into shorts and a crop top. Maria then took GFP and her children to McDonald's for breakfast before going to the hotel. Maria used her passport and cash to rent a room on the first floor. They met appellant in the room, and Maria and appellant began having sex, which GFP described as "that disgusting thing," "s-e-x," meaning "when he put his penis inside Maria's vagina." Around noon, GFP was checking her phone when she heard Maria and appellant whispering; appellant asked Maria whether GFP was going to let herself get touched. GFP did not know what to say and stayed quiet. Appellant started touching her inside her shorts on her vagina, tickling it with his fingers. GFP closed her legs "really tight[ly]" to stop appellant from putting his hand inside her vagina. Appellant also put his hand inside GFP's shirt and bra and touched her "titties." At some point during the incident, appellant gave Maria money.

Moon next testified that GFP told her about a second incident, which began much like the first; Maria picked GFP up from school and took her home to change. However, this time GFP made sure she was wearing pants and a shirt "that was covering." They met appellant at an IHOP for breakfast and proceeded to the same hotel. Unlike the previous occasion, the

---

[9] The three incidents GFP related to Moon during the interview are the same as those disclosed to Bremner at GFP's school.

room only had one bed. Because Maria and appellant were "moving [it] too much," GFP sat in a chair but made herself sick from spinning it. She threw up in the bathroom, and when she came out, Maria went to take a shower. Appellant called GFP over to the bed, touched her legs, and pulled her closer to him. He took off her pants and underwear and kissed and licked her vagina. Next, appellant tried to vaginally penetrate GFP with his penis. Although it "didn't fit at first," "then it did fit" and "hurt her a lot." When GFP told appellant that it hurt, he laughed. Appellant and Maria began to have sex, and GFP went to the bathroom to clean her vagina, which felt "gooey and sticky."

Lastly, Moon testified about the facts of the third incident GFP disclosed. Maria, accompanied by her two children, once again picked up GFP from school. This time, they drove straight to the hotel without stopping for breakfast. They met appellant outside the hotel and went to the room. GFP was told to take a shower, and Maria helped her to turn it on. After the shower, GFP redressed and wrapped herself in a blanket because it was cold. Maria got in the shower, and appellant took off GFP's clothes, laid her down, and kissed her. He "would start with kissing and licking her vagina, then would put his penis inside her vagina." With his penis inside her, appellant began to move back and forth. Maria came out of the shower, lied down next to GFP, and began licking and touching GFP's breasts per appellant's instruction. While appellant's penis was inside her, GFP's ribs began to hurt "the more he did it." When appellant "stopped," there was some "white stuff that came out and was on his penis and on her vagina."

At the first outcry hearing, following the witness' testimony, the State argued that Moon was the appropriate outcry witness because she had articulated "additional sexual acts that were not discussed with Officer Bremner," including breast touching and oral sex, which were

given as manners and means in counts I and III, respectively. The State also emphasized that GFP had disclosed two instances of "vaginal/penial penetration" to Moon but only one to Bremner. Calling this a "piecemeal outcry," the State alternatively asked that Bremner be permitted to testify as to the "partial" outcry, with additional acts and detail offered through Moon's testimony. The defense maintained that the outcry to Bremner had been adequate: "she gives enough information that there was a sexual assault that took place, and she goes into some detail about the penetration with the penis and the touching," which was "enough for that to constitute an outcry . . . of a sexual nature." The defense similarly agreed that there could be two outcry witnesses but insisted that Moon be limited to testifying only about "additional act[s]" disclosed for the first time during her interview with GFP.

The trial court, in making its ruling at the first hearing, explained, "Obviously, there is some significant portion of outcry to Officer Bremner, but I think that there is or there are significant differences including allegations of additional sexual contact or sexual assault. So I'm going to hold that Ms. Moon is the proper outcry witness." The defense in response again suggested that Bremner testify to "whatever statements were made to her" and that Moon testify "only to the differences." In addition, the defense contended that any statements made by GFP in response to Moon's questioning following the initial narrative be excluded from the outcry testimony because they were not "volunteered" but were being elicited through questioning. The State disagreed, and the trial court acknowledged:

> [T]hat's one of the fundamental problems with this exception to the hearsay rule. And that is, the real design here is to accommodate an outcry which theoretically ought to be a sort of spontaneous utterance and that's not what we're seeing. What we're seeing is specific detailed questioning by the forensic interviewer. That's why they're called a forensic interviewer. I think that's a totally different

10

issue. I think that the case law that I'm familiar with, at least at this point in time, indicates that that's appropriate. While I might not agree with that analysis, that is the analysis that I think I'm obligated to follow.

Ultimately, the trial court ruled that Moon was the proper outcry witness, and it would "allow Bremner to testify basically to exactly what she's already testified [to] here."

At the second outcry hearing, on October 21, 2019, both sides largely reiterated similar arguments. The defense contended that allowing either Bremner or Moon to testify as an outcry witness would introduce inadmissible hearsay testimony and violate appellant's rights to confrontation and due process. Nevertheless, if one of the two were to qualify as an outcry witness, the defense argued, it would be Bremner because she "was the first adult to whom the child gave a description or statement describing the alleged abuse in this case." Although Moon may have been provided more detail, the episodes or events were the same as those disclosed to Bremner, who had been told the "how, where, and what" of the abuse.

As at the first hearing, the trial court responded that it was "philosophically" inclined to agree with the defense but bound by the case law to rule in favor of the State's position because of the "particularity of the outcry to Ms. Moon compared to the sort of general lack of particularity with regard to the statements to Officer Bremner." When asked if it was saying that only Moon would be eligible to testify as an outcry witness, the trial court, deviating from its previous ruling of the first hearing, replied, "Now, if you're asking is Officer Bremner going to be able to testify to any outcry, the answer to that is no." The trial court clarified that it would not allow the State to "go into any details of the statement the complainant may have made to Officer Bremner" because:

11

[T]he distinction between the two [statements made to Bremner and Moon] only goes to the increased particularity of the outcry to Moon. So not to any discre[te]ly different incidents that would be supportive of two outcry witnesses. I think the only time that I would ever consider – and the case law indicates that there's a potential for more than one outcry is if we're talking about two different incidents or two different statements. Two different incidents I guess is a better way to phrase it.

The State agreed, in its argument at the second hearing, that the offense of continuous sexual abuse was covered by "everything the child said to Moon," to which the defense protested, asserting that GFP had told Bremner "how many instances there were and in general what happened and where it happened and who was there and so forth." The trial court once more noted that it was inclined to agree with the defense "from a philosophical and policy perspective" but that, based on the case law, Moon was the proper outcry witness, and no outcry testimony would be allowed through Bremner. It is this final ruling from the trial court that appellant challenges in the present appeal.

Bremner did not testify at trial. Prior to the start of trial, and again at the beginning of Moon's testimony, the trial court noted and overruled the defense's running objection to Moon's testimony on hearsay grounds and with regard to whether she was the proper outcry witness.

Article 38.072 applies only to statements describing the alleged offense. *See* Tex. Code Crim. Proc. art. 38.072. Continuous sexual abuse of a child requires proof that the offender has committed "two or more acts of sexual abuse," during a period of 30 days or more in duration. *See* Tex. Penal Code § 21.02(b), (c). Count I of the indictment alleged that appellant committed two or more predicate acts of sexual abuse, including aggravated sexual assault (causing penetration of GFP's sexual organ by appellant's sexual organ), aggravated

12

sexual assault (causing GFP's genitals to contact appellant's mouth), and/or indecency with a child by sexual contact (touching GFP's genitals).

GFP's statement to Bremner described at most a commission of the first manner of aggravated sexual assault. Contrary to the trial court's ruling, the "particularity," or detail, of the disclosure is not determinative of the proper outcry witness. *See Hines v. State*, 551 S.W.3d 771, 781 (Tex. App.—Fort Worth 2017, no pet.) ("We do not determine the sufficiency of a statement for outcry purposes simply by comparing different statements the child gave to different individuals and deciding which person received the most detailed statement about the offense."). We must instead look to whether child has described the offense in a "discernible manner." *Garcia*, 792 S.W.2d at 91. Nevertheless, GFP's allegations that appellant had "touched [her] over her clothing in her private area or private region"[10] or "kissed" her are— without more—insufficient to describe the predicate offenses charged in the indictment. Rather, these statements amount to mere "general allusion[s] that something in the area of child abuse was going on." *Lopez*, 343 S.W.3d at 140 (quoting *Garcia*, 792 S.W.2d at 91); *see Michell v. State*, 381 S.W.3d 554, 559 (Tex. App.—Eastland 2012, no pet.) (holding child's statements to 911 dispatcher and police officer that her mom "made her put her hands up in her," her dad "put his middle part up in her" and "put his male parts inside of her," and her parents "touched her in her private areas" were no more than general allusions to sexual abuse); *Thomas v. State*, 309 S.W.3d 576, 579 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (child's statement that

---

[10] Bremner testified that GFP alleged she was touched in her "private area" or "private region." While the prosecutor in a later question referred to the act as "vaginal touching," it is unclear from the record whether GFP specified the area touched in her statement to Bremner.

13

defendant "us[ed] his hands to touch her" was general allusion); *Sims v. State*, 12 S.W.3d 499, 500 (Tex. App.—Dallas 1999, pet. ref'd) (holding trial court did not abuse its discretion by not designating victim's mother as outcry witness where she had been told only that defendant "had touched [child's] private parts"). *Cf. Thomas*, 1 S.W.3d at 141 (holding child's mother was proper outcry witness where child told her defendant took her into his bedroom, "touched her private parts," and told her not to tell). GFP provided the "how, when, and where" for the first two incidents of abuse only in her subsequent disclosure to Moon. *See Reyes*, 274 S.W.3d at 727. It was only in the outcry to Moon that GFP for the first time alleged vaginal- and breast-touching during the first incident and oral sex during the second. Moreover, GFP's statement to Moon included an additional allegation of vaginal-penile penetration not made in the statement to Bremner.

From the record before us, we are unable to say that the trial court abused its discretion by finding that Moon was the proper outcry witness. *See Garcia*, 792 S.W.2d at 92. The trial court's ruling was not outside the zone of reasonable disagreement. *See Montgomery*, 810 S.W.2d at 391. Therefore, we overrule appellant's sole issue.

## II.     Modification of the Judgment

In a motion for judgment nunc pro tunc filed subsequent to this appeal, the State notes that the judgment forms for both counts erroneously state, "THIS SENTENCE SHALL RUN: N/A," and asks that we modify the forms to reflect the trial court's pronouncement at sentencing that the sentences run concurrently. A judgment nunc pro tunc provides a method to correct a discrepancy between the judgment as pronounced and that reflected in the record. *Blanton v. State*, 369 S.W.3d 894, 897 (Tex. Crim. App. 2012). "When there is a conflict between the oral

14

pronouncement of the sentence and the sentence in the written judgment, the oral pronouncement controls." *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004). The written judgment is just a "declaration and embodiment of that oral pronouncement." *Id.*

We have the authority to modify a trial court's judgments and affirm them as modified. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (courts of appeals have authority to modify judgment); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) ("Appellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record."). Accordingly, we grant the State's motion and modify the judgments for both counts to reflect that the sentences shall run concurrently.

## CONCLUSION

Having overruled appellant's single issue, we affirm the court's judgments of conviction as modified.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Kelly

Modified and, as Modified, Affirmed

Filed: January 21, 2022

Do Not Publish

15