Opinion filed April 30, 2024



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00100-CR

_____

**JESSE FELIPE ESPINOSA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-20-0592-CR**

## M E M O R A N D U M   O P I N I O N

Appellant, Jesse Felipe Espinosa, was charged by indictment with four counts of aggravated sexual assault of a child. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (a)(2)(B) (West 2019). The jury found Appellant guilty of Counts One, Three, and Four, and found Appellant not guilty of Count Two. The jury assessed his punishment at confinement in the Institutional Division of the

Texas Department of Criminal Justice for twelve years for each of the three counts. The trial court ordered the sentences for Count One and Count Three to run concurrently, and the sentence for Count Four to run consecutively to the sentences imposed in Counts One and Three.

In four issues on appeal, Appellant contends that the trial court erred when it (1) prevented him from asking the venire panel whether they could consider the full range of punishment; (2) incorrectly determined that the State's proposed outcry witness was the proper outcry witness under Article 38.072 of the Texas Code of Criminal Procedure; (3) gave incomplete definitions of "intentionally" and "knowingly" in its guilt/innocence charge; and (4) failed to include the exact language required by Article 37.07, Section (4)(a) of the Texas Code of Criminal Procedure in its punishment charge. We affirm.

*Background Facts*

V.M. was ten years old when Appellant, her mother's boyfriend, sexually assaulted her. V.M. and her two siblings were home alone with Appellant after V.M.'s mother had gone to work. V.M. called her mother around "10:00, 10:30" a.m. and was "just crying and crying and crying" on the phone. Based on V.M.'s behavior on the phone call, V.M.'s mother decided to leave work and return home. When V.M.'s mother arrived and asked V.M. what happened, V.M. told her that Appellant "touch[ed] her in places he wasn't supposed to." V.M.'s mother called the police. The police began an investigation at the home and instructed V.M.'s mother to take V.M. to "Harmony Home," a child advocacy center.

Genieva Lujan, the forensic interviewer who interviewed V.M. at Harmony Home, testified as an outcry witness. V.M. shared the details of the assault with Lujan. After the forensic interview, V.M. was taken to a hospital for a SANE (sexual assault nurse examiner) exam. Martha Banda, the SANE who performed V.M.'s

2

exam, recounted V.M.'s description of the sexual assault and testified that she observed injuries to V.M.'s vagina and anus. Yahaira Romero, a DNA analyst for the Texas Department of Public Safety Crime Laboratory, testified that Appellant was a possible contributor to the DNA profiles obtained from swabs of V.M.'s left breast, stomach, lip, and panties.

*Analysis*

*Voir Dire*

In Appellant's first issue, he asserts that the trial court erroneously prevented his trial counsel from individually questioning venirepersons about their ability to consider the full range of punishment. At the start of voir dire, the trial court explained that Appellant had been charged with four counts of the first-degree felony offense of aggravated sexual assault of a child, that the range of punishment for a first-degree felony included five-to-ninety-nine years or life in prison, and that if the jury found Appellant guilty, then the jury would be required to consider the entire range of punishment when sentencing Appellant. The trial court then asked if any venirepersons thought they would be unable to consider the full range of punishment and noted on the record that two venirepersons indicated that they would not be able to do so.

The State elaborated on the trial court's explanation of the jury's requirement to consider the full range of punishment and asked venirepersons several questions about whether they would be able to fulfill that requirement. At one point, the State told the venire panel, "I'm not asking what you would give. I'm asking whether or not you can think of a situation where five [years] might be [an] appropriate" sentence. The trial court added that the purpose of the State's question was to "make sure that if you serve . . . that you will consider the entire range of punishment before you assess whatever your ultimate punishment will be." Appellant's trial counsel

3

asked to approach the bench after the trial court's explanation and informed the trial court that he believed it gave "an incorrect statement as to what the law is." Appellant's trial counsel argued that the venire panel would "have to say that they will consider, which means they can envision a set of facts where they would give a five-year sentence." The trial court said it agreed with trial counsel. After the bench conference, the trial court told the venire panel:

> So do you understand that these lawyers need to know can you consider a situation where you would -- the entire range of punishment, from the very lowest of the low end might be appropriate or can you envision a situation where considering the entire range of punishment that the upper level, the far end of the upper level might be or would be appropriate; does everybody understand this?

When the venire panel indicated that they understood, the State reiterated that it was asking the venire panel "to think that there is a possibility where five would be appropriate." The State then asked, "[I]s there anyone who says, I cannot do that and I cannot consider a minimum of five years for this charge?" The State noted on the record the venirepersons that indicated that they would not be able to consider a five-year prison sentence.

Appellant's trial counsel began his voir dire examination by individually questioning venirepersons as follows:

> [DEFENSE COUNSEL]: You said that you could envision facts where you would give somebody five years for aggravated assault sexual assault of a child; is that correct?
>
> PROSPECTIVE JUROR [ONE]: Correct.
>
> [DEFENSE COUNSEL]: That is correct. What facts would those by [sic] that come to your mind.
>
> PROSPECTIVE JUROR [ONE]: I wouldn't be able to tell until I heard the evidence.

4

[DEFENSE COUNSEL]:  So you can't envision any facts now where you would give a five-year sentence for aggravated sexual assault of a child?

PROSPECTIVE JUROR [ONE]:  I'm not understanding the question.

[DEFENSE COUNSEL]: Can you envision any set of facts or circumstances where you could give five years in prison for aggravated sexual assault of a child?

PROSPECTIVE JUROR [ONE]:  No.

[DEFENSE COUNSEL]:  Thank you.  Can you, sir, Juror No. 2?

PROSPECTIVE JUROR [TWO]:  No, sir.

[DEFENSE COUNSEL]:  No facts or circumstances where you could give five years?

PROSPECTIVE JUROR [TWO]:  I need the facts.

[DEFENSE COUNSEL]:  But right now, you're unable to do so; is that correct?

PROSPECTIVE JUROR [TWO]:  No, sir.

This line of questioning continued through Prospective Juror No. 6, until the trial court interjected to clarify that:

[W]hat we are visiting with you about, me, the prosecutor, and now [Appellant's trial counsel], is the same idea that we need jurors who can assure all of us that if you serve as a juror, you will consider -- and by then you will have received a ton of evidence, of information -- but that you will consider the entire range when you are determining what is -- before determining, in your own mind, what is the appropriate sentence.

The trial court then asked the venire panel whether anyone would be unable to consider five years' punishment and instructed Appellant's trial counsel to continue after receiving no response.

Appellant's trial counsel proceeded to ask a prospective juror if, "no matter how we stretch it, how we fumble through it . . . would you be able to consider a five-year sentence in any case involving aggravated sexual assault of a child?" The prospective juror responded "Yes, I will be able to consider the full range." Appellant's trial counsel then asked the prospective juror, "Can you tell me what type of hypothetical situation comes to your mind where you could give a five-year sentence for aggravated sexual assault of a child?" The State objected and asserted that the question was an improper commitment question. The trial court sustained the objection. Appellant's trial counsel asked to approach the bench.

After a conversation about the purpose and propriety of Appellant's trial counsel's question, the trial court explained that the question of whether the venire panel could "give" five years' imprisonment was impermissibly different from the question of whether the panel could "consider" five years' imprisonment. The trial court instructed counsel that "the appropriate question pertains to whether they would consider the entire range. If they would not consider five or if they wouldn't consider 99 or life." Appellant's trial counsel told the trial court that he would "stop with the question after noting that I object to the Court's ruling, and I think I'm entitled to ask the question, give me a set of facts that you could give five years." Appellant's trial counsel addressed the venire panel and stated:

> So I'll refrain from asking that question any further, and I assume that all of you on this panel are here to tell the truth will tell me [sic] that there are certain sets of facts in your mind where you could give a five-year sentence for aggravated sexual assault of a child, not that you could consider it and not do it, but that you could do it. Is that true of everybody now?

Yes? Okay. Great. That's good because to qualify the juror, you have to be able to consider and give the full range of punishment for a certain crime. That's why there's a range. So I appreciate y'all telling me that you could do so, and I don't [sic] drill on it any further at this time."

Appellant's trial counsel then moved on to a different voir dire topic.

Appellant asserts that the trial court "effectively required [his trial counsel] to halt his individual questioning of the jury venire regarding their ability to consider the full range of punishment." Appellant's issue is focused on his trial counsel's question, "Can you envision any set of facts or circumstances where you could give five years in prison for aggravated sexual assault of a child?" and the trial court's "interrupt[ion]" to "admonish[] the venire, that in order to be eligible to sit as a juror in this case, they would have to agree that they could consider the entire range of punishment." Appellant does not challenge the trial court's act of sustaining the State's objection that Appellant's trial counsel asked an improper commitment question or the trial court's instruction that Appellant's trial counsel asked the venire panel whether they could "consider," not "give," five years' imprisonment for the offense of aggravated sexual assault of a child.

Instead, Appellant asserts that the trial court's "interrupt[ion]" of his questioning was an "implicit denial" of his right to individually question venirepersons about their ability to consider the full range of punishment. Appellant contends that this implicit denial violated his right to due process because he was denied "the right to be judged by 12 non-biased citizens of Ector County." Appellant further asserts that his trial counsel did not make any additional challenges for cause after the State's challenges "apparently due to the fact that he had been denied the opportunity to continue to individually ask the venire the question he asked of the first six potential jurors."

The State responds that the question at issue was "vague, overly broad, and to the extent a venire member would have responded with specific facts, an improper commitment question." Thus, the State contends, the trial court did not abuse its discretion when it "merely limited [Appellant's trial counsel's] question due to its

form" because the question was "confusing to the venire." The State further asserts that the trial court did not "place an absolute prohibition" on Appellant's trial counsel's line of questioning, but "restrict[ed]" the question "to tailor the inquiry to one that would be understood and yield responses which might give rise to a valid challenge for cause."

The trial court has "broad discretion in the manner it chooses to conduct voir dire, both as to the topics that will be addressed, and the form and substance of the questions" each party asks to address them. *Jacobs v. State*, 560 S.W.3d 205, 210 (Tex. Crim. App. 2018); *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). The trial court will only abuse its discretion if its voir dire limitation "render[s] the defendant's trial fundamentally unfair." *Jacobs*, 560 S.W.3d at 212 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 425–26 (1991). "A trial court retains discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions." *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012) (citing *Barajas*, 93 S.W.3d at 38–39).

Appellant's trial counsel was not absolutely prohibited from asking the venire panel if they could consider the full range of punishment at any point during his voir dire. After the trial court's interjection, it permitted Appellant's trial counsel to continue asking questions about whether venirepersons could consider the minimum punishment.[1] When the State objected to Appellant's trial counsel's subsequent question about a "hypothetical situation [that] comes to your mind" that would warrant a sentence of five years' imprisonment, the trial court did not instruct Appellant's trial counsel to end his line of questioning. Instead, the trial court clarified that Appellant's trial counsel "can ask them if they can consider a

---

[1]The trial court made a similar interjection to explain the purpose of the State's range-of-punishment question and similarly allowed the State to continue its questioning afterwards.

situation. . . . But you can't say what are those facts, that that's not appropriate." Accordingly, the record does not reflect that the trial court's interjection to Appellant's first question wholly prevented Appellant's trial counsel from questioning the venire panel about their ability to consider the full range of punishment. Rather, it only reflects that the trial court interjected to provide an explanation of the purpose of trial counsel's questions to venirepersons—one of whom had previously expressed his confusion about Appellant's trial counsel's question.

Further, although jurors must make a commitment to follow the law, which includes a commitment to consider the full range of punishment, commitment questions that are not required by the law are "invariably improper." *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001). Specifically, "an attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts." *Id.* at 179. "[A]n open-ended question can be a commitment question if the question asks the prospective juror to set the hypothetical parameters for his decision-making." *Id.* at 180 (citing *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991) ("An example of an open-ended commitment question is: 'What circumstances in your opinion warrant the imposition of the death penalty?'")); *see Davis v. State*, 349 S.W.3d 517, 519 (Tex. Crim. App. 2011) (citing *Standefer* for the proposition that "ask[ing] jurors to define situations in which they would impose a specific sentence" would have been an improper commitment question.).

Here, Appellant's trial counsel asked: "[c]an you envision any set of facts or circumstances where you could give five years in prison for aggravated sexual assault of a child?" This is precisely the type of improper commitment question that *Standefer* prohibits. *See Standefer*, 59 S.W.3d at 181; *see also Davis*, 349 S.W.3d at 519 ("The *Standefer* example asked jurors to define situations in which they would

impose a specific sentence. Had this appellant's counsel asked jurors what circumstances would warrant the maximum punishment for aggravated robbery with a deadly weapon, that would have been an impermissible commitment question."). Therefore, even if the trial court *was* signaling to Appellant's trial counsel that he should refrain from continuing to ask the specific question at issue, it would not have abused its discretion in doing so.

Finally, the record does not support Appellant's assertions that (1) his trial counsel was unable to make additional challenges for cause because he was unable to question venirepersons about their ability to consider the full range of punishment, and (2) venirepersons who were unwilling to consider the full range of punishment were empaneled as jurors. We have already concluded that Appellant was not prevented from properly questioning individual venirepersons about their ability to consider the full range of punishment, and that both parties and the trial court extensively questioned venirepersons about their ability to do so. After the State made its challenges for cause, the trial court asked Appellant's trial counsel if he had any additional challenges for cause to make. Appellant's trial counsel responded, "That's fine, Judge. That got rid of them." Finally, nothing in the record suggests that any venireperson who indicated that they would be unable to consider the full range of punishment was empaneled as a juror.

We conclude that the trial court did not abuse its discretion when it interjected to explain the purpose of Appellant's trial counsel's question, "Can you envision any set of facts or circumstances where you could give five years in prison for aggravated sexual assault of a child?" and that it did not improperly prevent Appellant's trial counsel from questioning venirepersons with proper questions about their ability to consider the full range of punishment. We overrule Appellant's first issue.

10

*Outcry Witness*

In his second issue, Appellant contends that the trial court abused its discretion when it "failed to accurately determine which witness was the appropriate outcry witness based on the 'time' element required under Article 38.072." *See* Tex. Code Crim. Proc. Ann. art. 38.072 (West Supp. 2023). Appellant contends that Lujan, the forensic interviewer at Harmony Home, should not have been permitted to testify as an outcry witness at trial because V.M.'s mother was the first person over the age of eighteen to whom V.M. described being the victim of aggravated sexual assault. *See id.*

The State asserts that Appellant has waived the issue because he failed to articulate in his brief how he was harmed by the trial court's alleged error. Irrespective of Appellant's failure to assert how the trial court's alleged error harmed him, we conclude that the trial court did not err when it permitted Lujan to testify as an outcry witness at trial.

"[A]n outcry witness, under Code of Criminal Procedure art. 38.072, is the first adult to whom a child or disabled individual describes being the victim of certain crimes, including many sexual crimes." *Sanchez v. State*, 354 S.W.3d 476, 479 n.1 (Tex. Crim. App. 2011). Aggravated sexual assault of a child is one of the offenses to which Article 38.072 applies. Crim. Proc. art. 38.072, § 1(1); Penal § 22.021(a)(1). Under Article 38.072, "[a]n outcry witness may testify, as an exception to the hearsay rule, about the victim's out-of-court description of the offense." *Sanchez*, 354 S.W.3d at 479 n.1.

Article 38.072 requires that, at least fourteen days before proceedings begin, (1) the party intending to offer the outcry statement provides the adverse party with notice of its intent to offer the statement, the name of the witness through whom the party intends to offer the statement, and a written summary of the statement; and

(2) the trial court holds a hearing outside the presence of the jury in order to determine whether the statement is reliable. CRIM. PROC. art. 38.072 § 2(b). The child must testify or be available to testify at the hearing. *Id.*

The sole purpose of an Article 38.072 hearing is to determine the "reliability" of the outcry—that is, "the time, content, and circumstances of the statement" that was made to the outcry witness. *See* CRIM. PROC. art. 38.072 § 2(b)(2); *Sanchez*, 354 S.W.3d at 487–88 (citing *Holland v. State*, 770 S.W.2d 56, 59 (Tex. App.—Austin 1989), *aff'd*, 802 S.W.2d 696 (Tex. Crim. App. 1991); *Broderick v. State*, 89 S.W.3d 696, 697–98 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd)).

The trial court held its Article 38.072 hearing more than a month before trial. The State called Lujan to testify at the outcry hearing. Lujan recounted her interview with V.M., including the details V.M. gave her about the sexual assault. V.M. told Lujan that Appellant had grabbed V.M.'s hand and made her touch "his private area," "put his fingers into her private area," "kiss[ed]" her "private area," stomach, and breast, and put his "stomach and his private in her backside."

Lujan testified that she believed she was the first person to hear the details of what happened to V.M. Lujan asked V.M. if she told anyone else what had happened, and V.M. told Lujan that she only told her mom that Appellant "had touched her where she's not supposed to be touched."

After Lujan's testimony, the State made an argument in support of designating Lujan as the proper outcry witness. Afterwards, Appellant's trial counsel stated that he agreed that Lujan was "a permissible outcry witness." The trial court ruled at the end of the outcry hearing that it had considered the time, content, and circumstances of the outcry and that it found the outcry to be reliable. The trial court further ordered that Lujan would be permitted to testify at trial as an outcry witness under Article 38.072.

The first person to testify at trial was V.M.'s mother. On direct examination, V.M.'s mother testified that, after she arrived home, V.M. told her Appellant had "ended up taking her to [her mother's] room and he started touching [V.M.] in places he wasn't supposed to . . . which we would call them the no-no spots." V.M.'s mother testified that she called the police and was instructed to take V.M. to Harmony Home.

On cross-examination, Appellant's trial counsel asked V.M.'s mother, "And did [V.M.] tell you what happened?" V.M.'s mother responded that V.M. had told her that Appellant touched V.M. "in her private area" with "[h]is hands and his private area as well." When Appellant's trial counsel asked V.M.'s mother if V.M. had told her that Appellant had touched her anus, V.M.'s mother said that V.M. "wasn't descriptive, but [V.M.] said [Appellant] touched her."

Potentially due to the nature of the questions asked by Appellant's trial counsel, V.M.'s mother gave conflicting testimony as to when V.M. gave her details of the assault—before or after the forensic interview at Harmony Home. V.M.'s mother first testified that she only learned specifics of the assault "after" V.M.'s interview at Harmony Home, but she subsequently testified that she learned some specifics of the assault before going to Harmony Home. Later, V.M.'s mother reiterated that V.M. "didn't tell [her] much" before going to Harmony Home.

V.M. also testified at trial. After recounting the assault, V.M. testified that she told her mother that Appellant "had touched [her] in places he wasn't supposed to." When the State asked V.M. if she told her mother the details of the assault before her interview at Harmony Home, V.M. answered, "No."

After V.M.'s testimony, and outside the presence of the jury, Appellant's trial counsel asserted that Lujan was not properly designated as an outcry witness because V.M.'s mother was "the first person over 18 years of age" to hear details of V.M.'s

13

sexual assault, "well before [V.M.] went to Harmony Home." Appellant's trial counsel argued that Lujan should not be able to testify about the details of the incident that V.M.'s mother had already testified to because the State "get[s] one hearsay witness . . . and only one." The State's response was that the questions Appellant's trial counsel asked V.M.'s mother were "incredibly confusing," that the defense was the only party to elicit hearsay from V.M.'s mother regarding details of the assault, and that the trial court had already determined that Lujan was the first person V.M. talked to about details of the incident. After hearing the parties' arguments and reviewing the parties' cited case law in support of their arguments, the trial court made the following finding:

> The Court has considered the testimony received at the outcry hearing, has considered all of the testimony as received today, and finds that the Harmony Home forensic interviewer, Ms. Lujan, was the first adult to whom the victim described the abuse in this case in some discernible way, and that this was the victim's first statement detailing the how, when, and where the assault occurred. And so the Court respectfully overrules the objection.

Lujan subsequently testified about V.M.'s forensic interview and the details V.M. gave about the sexual assault.

Appellant asserts that the trial court abused its discretion when it permitted Lujan to testify about V.M.'s forensic interview after V.M. had already made an "essentially identical" outcry to her mother. A trial court has broad discretion to determine the admissibility of outcry evidence, and we will not disturb its determination as to the proper outcry witness absent a showing in the record that the trial court clearly abused its discretion. *See Garcia*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990); *Smith v. State*, 131 S.W.3d 928, 931 (Tex. App.—Eastland 2004, pet. ref'd). We will uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

14

A proper outcry statement must describe the alleged offense in some discernible manner and must be more than a general allusion that something in the area of child abuse occurred. *Garcia*, 792 S.W.2d at 91. Any statement that "arguably relates" to something that later evolves into an allegation of child abuse will not satisfy the requirements of the statute. *Id.* In general, the proper outcry witness is the first adult to whom the child victim describes "how, when, and where" the abuse occurred. *Reyes v. State*, 274 S.W.3d 724, 727 (Tex. App.—San Antonio 2008, pet. ref'd). If the child makes only a general allusion to the first adult and gives a more detailed account to a second adult, the second adult may be the proper outcry witness. *See Garcia*, 792 S.W.2d at 91.

Lujan previously testified at the outcry hearing that she believed she was the first person to hear about the details of the assault, as V.M. had only told her mother that Appellant "touched her where she's not supposed to be touched" by the time of the Harmony Home interview. During their testimony at trial, V.M.'s mother, V.M., and Lujan testified that V.M. only told her mother that Appellant had touched her where he "wasn't supposed to" before going to Harmony Home. While V.M.'s mother at one point gave conflicting testimony as to whether V.M. told her details of the assault before or after V.M.'s interview at Harmony Home, it is not unreasonable to conclude that V.M.'s mother may have been confused by the questions from Appellant's trial counsel. Furthermore, three witnesses testified at trial that V.M. only told her mother that Appellant touched her where he "wasn't supposed to" before the Harmony Home interview.

The trial court could have reasonably concluded that (1) V.M. did not tell her mother the details of the assault before her interview at Harmony Home, and (2) V.M.'s statement that Appellant touched her where he "wasn't supposed to" was no more than a "general allusion" to sexual abuse. *See id.*; *see also Michell v. State*,

15

381 S.W.3d 554, 559 (Tex. App.—Eastland 2012, no pet.) (Holding that a child's statement to an officer that her parents "touched her in her private areas" was "no more than [a] general allusion[] to sexual abuse."); *Smith*, 131 S.W.3d at 931 (Holding that a child's statement that the "appellant 'had been performing oral sex on him' did not relay any specific details about the charged offense" and was a "general allusion" to sexual abuse.); *Sims v. State*, 12 S.W.3d 499, 500 (Tex. App.—Dallas 1999, pet. ref'd) (Holding that the trial court could have reasonably determined that a child's statement that the appellant "had touched her private parts" was "nothing more than a general allusion that something in the area of sexual abuse was occurring and not a clear description of the offense charged as required by article 38.072.").

Although the majority of Appellant's argument focuses on his contention that the trial court incorrectly found that Lujan could testify as an outcry witness, Appellant briefly asserts in a footnote that the trial court allowed a third outcry witness to testify—Banda, the SANE. Appellant does not elaborate on this contention, and notes that his trial counsel did not object to Banda's testimony at trial. While Appellant's contention is neither properly preserved nor properly briefed, we would note that this court has very recently reaffirmed that SANE testimony concerning a sexual assault victim's description of the assault is admissible under Texas Rules of Evidence 803(4) as an exception to the hearsay rule. *See Trollinger v. State*, No. 11-22-00089-CR, 2023 WL 5622111, at *2–3 (Tex. App—Eastland 2023, no pet.) (mem.op., not designated for publication); *see also* TEX. R. EVID. 803(4).

Because the trial court could have reasonably concluded that Lujan was the first person to hear details of the "how, when, and where" of the sexual abuse Appellant committed against V.M., the trial court did not abuse its discretion in

16

allowing Lujan to testify as an outcry witness under Article 38.072. *See Sims*, 12 S.W.3d at 500; *Michell*, 381 S.W.3d at 559–60. We overrule Appellant's second issue.

*Charge Error – Incorrect Definitional Elements of "Intentionally" and "Knowingly"*

In Appellant's third issue, he contends that the trial court erred when it provided a "limited definition" of the words "intentionally" and "knowingly" in its charge. The trial court is required to give the jury a written charge "setting forth the law applicable to the case." CRIM. PROC. art. 36.14 (West 2007); *Vega v. State*, 394 S.W.3d 514, 518 (Tex. Crim. App. 2013). A review of alleged jury-charge error involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). We must first determine whether the charge contained any actual error. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. If there was actual error, we must next determine whether the error resulted in sufficient harm to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. If an appellant fails to object to or present a properly requested jury charge, any error in the charge "should be reviewed only for 'egregious harm' under *Almanza*." *Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

There are three conduct elements that may be involved in an offense: the nature of the conduct, the result of the conduct, and the circumstances surrounding the conduct. *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011). An offense may contain any one or more of these conduct elements that alone or in combination form the overall behavior that the Legislature has intended to criminalize, and it is these essential conduct elements to which a culpable mental

17

state must apply. *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). A trial court errs when it fails to tailor the definitions of the culpable mental states to the conduct element or elements of the offense to which they apply. *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994).

The trial court included the following definitions of "intentionally" and "knowingly" in its charge:

> A person acts *intentionally*, or with intent, with respect to a result of his conduct, when it is his conscious objective or desire to cause the result.
> A person acts *knowingly*, or with knowledge, with respect to a result of his conduct, when he is aware that his conduct is reasonably certain to cause the result.

Appellant asserts that the trial court erred in only including the "result of conduct" definition in its charge because "[t]he element 'a child who was then and there younger than 14 years of age' refers to the circumstances surrounding the conduct," and the alleged contact Appellant made refers to the "nature of the conduct." Appellant contends that the charge's incorrect definitions deprived him of due process and a fair trial.

The State correctly responds that the Court of Criminal Appeals "explicitly stated that aggravated sexual assault is a nature of conduct offense" in *Metcalf v. State* and *Gonzales v. State*. *See Metcalf v. State*, 597 S.W.3d 847, 857 (Tex. Crim. App. 2020); *Gonzales v. State*, 304 S.W.3d 838, 849 (Tex. Crim. App. 2010); *see also Martinez v. State*, No. 11-13-00080-CR, 2015 WL 1322315, at *6 (Tex. App.— Eastland 2015, pet. ref'd) (mem. op., not designated for publication) ("[T]he Court of Criminal Appeals has explicitly stated that aggravated sexual assault is a 'nature-of-conduct' statute."). Therefore, the trial court erred when it did not include a

proper "nature of the conduct" definition in its definitions of "intentionally" and "knowingly." *See Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015).

Because Appellant did not object to the definitions of "intentionally" and "knowingly" as included in the guilt/innocence jury charge, reversal is required only if the alleged error resulted in egregious harm. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)).

Egregious harm is only shown when the error "created such harm that [the appellant] 'has not had a fair and impartial trial.'" *Almanza*, 686 S.W.2d at 171. In *Almanza*, the Texas Court of Criminal Appeals outlined four factors that a reviewing court should consider when determining whether a jury charge error resulted in egregious harm: (1) the charge itself; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *See Villarreal*, 453 S.W.3d at 433.

First, we analyze the erroneous instruction in relation to the jury charge as a whole. *Id.*; *Almanza*, 686 S.W.2d at 171. "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see Kuhn v. State*, 393 S.W.3d 519, 529 (Tex. App.—Austin 2013, pet. ref'd) ("Texas courts have

repeatedly held that where the application paragraph of the charge correctly instructs the jury on the law applicable to the case, this mitigates against a finding that any error in the abstract portion of the charge was egregious."). Here, the application paragraphs in Counts One, Three, and Four stated:

**<u>COUNT 1- AGGRAVATED SEXUAL ASSAULT OF A CHILD:</u>**

Now, if you find from the evidence beyond a reasonable doubt that on or about April 13, 2020, in Ector County, Texas, JESSE FELIPE ESPINOSA, did then and there, intentionally or knowingly cause the sexual organ of "VM", a child who was younger than 14 years of age, to contact the sexual organ of the Defendant, then you will find the Defendant guilty as charged in **Count 1** of the indictment and sign **Verdict Form 1**.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant and sign **Verdict Form 2**.

. . . .

**<u>COUNT 3 AGGRAVATED SEXUAL ASSAULT OF A CHILD:</u>**

Now, if you find from the evidence beyond a reasonable doubt that on or about April 13, 2020, in Ector County, Texas, JESSE FELIPE ESPINOSA, did then and there, intentionally or knowingly cause the sexual organ of "VM", a child who was younger than 14 years of age, to contact the mouth of the Defendant, then you will find the Defendant guilty as charged in **Count 3** of the indictment and sign **Verdict Form 5**.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant and sign **Verdict Form 6**.

**<u>COUNT 4 – AGGRAVATED SEXUAL ASSAULT OF A CHILD:</u>**

Now, if you find from the evidence beyond a reasonable doubt that on or about April 13, 2020, in Ector County, Texas, JESSE FELIPE ESPINOSA, did then and there, intentionally or knowingly cause the penetration of the sexual organ of "VM", a child who was younger than 14 years of age, by the means of the finger(s) of the Defendant, then

you will find the Defendant guilty as charged in **Count 4** of the indictment and sign **Verdict Form 7**.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant and sign **Verdict Form 8**.

The language of the application paragraphs sufficiently tracked the language of the statute and the indictment and correctly applied the "intentionally" and "knowingly" *mens rea* elements. *See* PENAL § 22.021. Thus, the correct application paragraphs weigh against a finding of egregious harm. *See Medina*, 7 S.W.3d at 640.

Second, we examine the state of the evidence. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. Appellant's theory of the case was that the assault did not happen, and his main defensive strategies were to attack the credibility of V.M.'s mother and to question the accuracy of the DNA testing.

During cross-examination of V.M.'s mother, Appellant's trial counsel focused on the fact that V.M.'s mother had more than one marriage, had previously had Child Protective Services visit her home, and that her children had previously had lice in their hair. Appellant's trial counsel also focused on the contents of V.M.'s statement to her mother before her interview at Harmony Home, and questioned V.M.'s mother about her testimony regarding her and Appellant's "intimacy issues."

Appellant testified in his own defense. Appellant stated that V.M.'s mother never kept a clean home, that her children often had lice in their hair, and that Child Protective Services had previously been to the home. Appellant denied sexually assaulting V.M. and testified that he was running errands at the time the assault allegedly occurred.

Appellant also called a DNA specialist to testify about the DNA results from the swabs taken during V.M.'s SANE exam. The expert testified about the possibility that Appellant's DNA could be present on V.M.'s person and clothes due

to V.M. and Appellant sharing a home and a washing machine, that DNA testing cannot reveal whether the DNA came from "a kiss or a touch," and that testing could have been, but was not, done to see whether Appellant's saliva was present on the swabs taken from V.M.'s person.

Therefore, Appellant's *mens rea* was not an issue at trial. Appellant did not contend that he did not have the requisite intent to assault V.M. Rather, Appellant's theory of the case was that the assault did not happen, and Appellant's defensive theories were focused on attacking the credibility of V.M.'s mother and the testing of the DNA evidence. Accordingly, the state of the evidence weighs against a finding of egregious harm with respect to the manner in which "intentionally" and "knowingly" were defined in the abstract portions of the trial court's charge.

Third, we consider the arguments of counsel. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. Appellant's trial counsel's closing argument was focused on the fact that no blood or semen had been recovered from the scene or from V.M.'s person. Further, the State did not discuss Appellant's intent or knowledge during its opening or closing argument. Rather, the State focused on V.M.'s statement, the injuries to V.M. that were documented during her SANE exam, and the DNA evidence. Therefore, because the matter of Appellant's intent or knowledge was not a focus of counsels' arguments, the third factor weighs against a finding of egregious harm.

Fourth, we consider any other relevant information contained in the record. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. There is nothing in the record to indicate that the jury was unable to render a correct verdict based on the erroneous definitions of "intentionally" and "knowingly." The jury's only notes to the trial court during guilt/innocence deliberations were "Request DNA evidence" and "VM testimony." As such, the record does not demonstrate that the erroneous

definitions impacted the jury's ability to determine whether Appellant had the requisite intent or knowledge to sexually assault V.M., and this factor weighs against a finding of egregious harm.

Because none of the *Almanza* factors demonstrate that Appellant's defensive theories were affected by the erroneous definitions of "intentionally" and "knowingly" contained in the jury charge or that the error created such harm that Appellant "has not had a fair and impartial trial," we overrule Appellant's third issue.

*Charge Error – Parole Law Instruction Under Article 37.07, Section 4(a)*

In Appellant's fourth issue, he contends that the trial court committed reversible error when it included variations of the parole-law instruction codified in Article 37.07, Section 4(a) in its punishment charge. CRIM. PROC. art. 37.07, § 4(a). Section 4(a) states that the trial court shall instruct the jury during the punishment phase as follows:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.

> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

*Id.* Here, the relevant portion of the trial court's punishment charge read as follows:

The length of time for which a defendant is imprisoned may be reduced by the award of parole.

Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, the Defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.

It cannot be accurately predicted how the parole law might be applied to this Defendant if sentenced to a term of imprisonment because the application of that law will depend on decisions made by parole authorities.

You may consider the existence of the parole law. However, you are not to consider the matter in which the parole law may be applied to this particular Defendant.

Appellant contends that the trial court erred when it added the sentence, "It cannot be accurately predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment because the application of that law will depend on decisions made by parole authorities," to its charge because the sentence is not found in Section 4(a). However, Appellant's contention is incorrect, as that exact sentence *is* found in the current version of Section 4(a).[2] *See* CRIM. PROC. art. 37.07, § 4(a). Therefore, the trial court properly included—and was required to include— the sentence in its charge, and it did not err in doing so. *See Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002).

---

[2]The Texas Legislature last amended Texas Code of Criminal Procedure Article 37.07, section 4(a)–(c) in 2019. Act of May 15, 2019, 86th Leg., R.S., ch. 260, § 3, 2019 Tex. Gen Laws 446, 446–48 (codified at CRIM. PROC. art. 37.07, § 4(a)–(c)). The current version applies to any defendant sentenced after September 1, 2019. *See id.* at 448; *Lewis v. State*, No. 09-21-00082-CR, 2021 WL 6129129, at *8 (Tex. App.—Beaumont Dec. 29, 2021, no pet.) (mem. op., not designated for publication). Appellant was sentenced on April 8, 2022.

Appellant also contends that the trial court erred when it omitted the language, "If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole," from its charge. The State asserts that the trial court did not err when it omitted the sentence from its charge because the omitted sentence is not the law applicable to the case. The State supports its proposition by noting that the minimum punishment for a first-degree felony is imprisonment for a term of five years, and that "the jurors could not possibly sentence appellant to 'a term of less than four years' on any count" as a result. *See* PENAL §§ 12.32, 22.021(e).

Regardless of whether the jury had the ability to sentence Appellant to imprisonment for a term of four years or less, any error in this regard did not result in egregious harm to Appellant. Appellant asserts that the trial court's erroneous charge, in combination with his other asserted errors, amount to a violation of his rights to due process and a fair trial. However, because Appellant made no objections to the punishment charge, reversal for the alleged jury charge error is only required if, under the *Almanza* factors, the alleged error resulted in egregious harm. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171.

We first analyze the erroneous omission in relation to the jury charge as a whole. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W. 2d at 171. Here, the jury was specifically instructed that while they "may consider the existence of the parole law," they could not "consider the matter in which the parole law may be applied to [Appellant]." Therefore, the mitigating language that was included in the punishment charge communicated to the jury that they could not consider Appellant's eligibility for parole in their sentencing. This "curative" instruction prevented harm to Appellant because it cautioned the jury that it could not consider parole during its assessment of punishment. *Newman v. State*, 49 S.W.3d 577, 581

(Tex. App.—Beaumont 2001, pet. ref'd). In the absence of evidence to the contrary, we presume the jury followed the instructions that the trial court gave in its charge. *See Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). Because the record does not indicate that the jury considered Appellant's possibility of parole during their deliberations, this factor weighs against a finding of egregious harm.

Second, we examine the state of the evidence. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. The only person who testified at punishment was Appellant's younger brother. Appellant's brother testified that Appellant has children and has "worked regularly throughout his life." When the State asked Appellant's brother "[i]f someone were to hurt your children or [Appellant's] children, would you want them to be punished?" Appellant's brother responded, "Yes." Therefore, neither side presented evidence regarding the possibility of parole, and the second factor weighs against a finding of egregious harm.

Third, we consider the argument of counsel. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. Both the State and Appellant waived their opening and closing arguments, necessarily meaning that neither party had an opportunity to mention parole to the jury. Therefore, counsel's arguments do not support a finding of egregious harm.

Fourth, we consider any other relevant information in the record. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. Where there is a jury note inquiring about parole, courts are more prone to find egregious harm. *Hooper v. State*, 255 S.W.3d 262, 272 (Tex. App.—Waco 2008, pet. ref'd). Here, the only note the jury sent to the trial court during punishment deliberations was whether the sentences would run concurrently or consecutively. Therefore, there is no indication

in the record that the jury was impermissibly considering Appellant's parole eligibility, and this factor weighs against a finding of egregious harm.

Because none of the *Almanza* factors demonstrate that Appellant's defensive theories were affected by the trial court's omission of a sentence required by Article 37.07 § 4(a) from its charge or that the error created such harm that Appellant "has not had a fair and impartial trial," Appellant's fourth issue is overruled.

*This Court's Ruling*

We affirm the judgments of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


April 30, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.